Michael J. EDWARDS, Appellant,

v.

UNITED STATES, Appellee.

No. 95–CF–960.

District of Columbia Court of Appeals.

Argued Oct. 30, 1997.
Decided Nov. 30, 1998.

John T. Moran, Washington, DC, appointed by the court, for appellant.

Ann K.H. Simon, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney at the time the brief was filed, and John R. Fisher and Patricia M. Haynes, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, STEADMAN and RUIZ, Associate Judges.

RUIZ, Associate Judge:

Michael J. Edwards was indicted on counts of first degree murder while armed (premeditated); assault with intent to kill while armed; possession of a firearm during a crime of violence; and carrying a pistol without a license.[1] These charges arose from an incident in which Edwards fatally shot one man, and shot and wounded a second, upon their perceived discovery that Edwards and a friend were attempting to dupe the men by selling them soap rather than cocaine. Edwards argued that he acted in self-defense in shooting both victims, but the trial court instructed the jury that it was to consider a claim of self-defense only as to the fatal shooting of one of the victims. Edwards was convicted by the jury of voluntary manslaughter while armed, as a lesser-included offense of armed first degree murder;[2] assault with a dangerous weapon, as a lesser-included offense of armed assault with intent to kill;[3] possession of a firearm during a

---

1. Violations, respectively, of D.C.Code §§ 22–2401, –3202; –501, –3202; –3204(b); and –3204(a) (1996).

2. D.C.Code §§ 22–2405, –3202.

3. D.C.Code § 22–502.

crime of violence; and carrying a pistol without a license.

Edwards appeals from these convictions, contending that several of the trial court's instructional and evidentiary rulings related to his claim of self-defense were in error. Specifically, Edwards claims that the trial court erred when it: 1) denied a self-defense jury instruction as to the non-fatal shooting; 2) instructed the jury to consider separately the threat Edwards perceived from each of the two shooting victims; 3) instructed the jury that Edwards could not claim self-defense if it found that he deliberately placed himself in a position he had reason to believe would provoke trouble; 4) excluded evidence of the assault victim's prior acts of violence which were unknown to Edwards at the time of the assault; and 5) failed to instruct the jury that it could consider the assault victim's prior acts of violence known to Edwards, and Edwards's opinions regarding the violent characters of both victims, in assessing the reasonableness of Edwards's fears for his own safety and in determining who was the aggressor. In addition, Edwards claims that the trial court erred by admitting evidence that the victims owed Edwards money from a previous drug sale, permitting the prosecutor to argue that this debt from a prior drug sale was Edwards's motive for the shooting, and failing to find explicitly that Edwards would not benefit from sentencing under the Youth Rehabilitation Act. Finding no merit in any of these arguments, we affirm.

## I.

Edwards's version of the facts of this case was presented to the jury in two forms: Edwards's confession, videotaped subsequent to his arrest, and his trial testimony.[4] Edwards admitted in his confession that he and his friend, Gary Martin, sold crack cocaine, and that on at least two previous occasions, Edwards had dealt drugs to William ("Showtime") Long for resale. Edwards recounted that on the night of the shootings, he and Martin plotted to recover forty dollars that Long owed them from a prior sale by delivering to Long soap instead of cocaine for resale to a buyer from West Virginia. Soon after Edwards returned from a restroom to Long's small room, where Martin, Long, A.W. Jackson, Jr., the West Virginian buyer and Long's teenage daughter were gathered, Long prepared to open the bags of fake cocaine onto a plate. Edwards stated that Long directed him to sit next to Jackson, and that upon rubbing the soap between his fingers, Long got a "frown" on his face, called for Jackson, and closed the door to the room. As Jackson placed his hand on Edwards's shoulder to push himself up and Edwards down, Edwards shot Jackson in the head. Edwards then saw Long lunge down from his seat and grab Edwards around his legs. Edwards shot almost straight down at Long, twice, before fleeing the room.

Edwards also stated in his confession that he was remembering Long's "tales of violence," which he took as a threat, at the time of the shooting. He explained that while he had never seen Jackson or Long with a gun, he understood that Jackson was "like Showtime's [Long's] bodyguard," and said that he had seen Long that night with a knife stuck between his pants and underwear. Edwards concluded the confession by stating that he "just felt like my life was in jeopardy," that he couldn't "wait and see," and that he "just reacted."

In his trial testimony, Edwards testified in greater detail about his relationship with Long and Jackson and the shootings. Edwards testified that he understood that Jackson carried a .357 magnum gun for protection. Edwards also testified that he and Martin had purchased a .380 magnum gun together. Edwards explained that just before the shootings, when Long frowned after touching the soap, Jackson first started to get up from the bed with both hands near his stomach, but then used his right hand to push off Edwards. Edwards said that at that moment, he realized for the first time that Long did not know that the bags contained soap—that Long "wasn't with the

---

4. We present Edwards's version of events because the standard of review for a trial court's denial of a requested self-defense instruction obliges us to view the evidence in the light most favorable to the defendant. *See Brown v. United States,* 619 A.2d 1180, 1182 (D.C.1992).

plan" to sell fake drugs to the West Virginian.

Edwards testified that he believed that Jackson was "reaching for a weapon," and that he thought he would have to "shoot [his] way out" of the room. Just before Edwards shot Jackson, he was struggling with Edwards, using both hands. Edwards explained that, at the moment he pulled the trigger, Jackson was no longer touching him at all, had no weapon in his hands, and was falling backwards onto the bed.

As to Long, Edwards testified that when he arrived at Long's building, he saw no knife in Long's waistband or anywhere else on Long's person. Edwards stated that after he shot Jackson, Long came towards him with both hands empty and extended. In Edwards's words, "[t]o be honest, I think I just turned and shot at him." When he fired a second shot at Long, Edwards said that he was standing directly above Long, who was "on his knees on the floor."

## II.

 Edwards contends that the trial court erred in instructing the jury that it could consider Edwards's claim of self-defense only as to his actions against Jackson, and not regarding his shooting of Long. We must review the evidence in the light most favorable to Edwards to determine whether, as a matter of law, the record supports his theory of self-defense in the shooting of Long. *See Brown v. United States,* 619 A.2d 1180, 1182 (D.C.1992).

> An accused is entitled to a requested instruction on the defense theory of the case if there is any evidence fairly tending to bear upon the issue ... however weak. But the trial judge may not give a self-defense instruction where the defendant, as a matter of law, has used excessive force.

*Harper v. United States,* 608 A.2d 152, 155 (D.C.1992) (internal quotations and citations omitted).

In *Harper, supra,* this court laid out the requirements for entitlement to a self-defense instruction as a matter of law:

> The right of self-defense is a law of necessity, arising only when the necessity begins, and equally ends with the necessity; and never must the necessity be greater than when the force employed defensively is deadly. There must have been a threat, actual or apparent, of the use of deadly force against the defender. The threat must have been unlawful and immediate. The defender must have believed that he [ ] was in imminent peril of death or serious bodily harm, and that his [ ] response was necessary to save himself [ ] therefrom. These beliefs must not only have been honestly entertained but also objectively reasonable in light of the surrounding circumstances. It is clear that no less than a concurrence of these elements will suffice.

*Id.* at 154–55 (internal quotations and citations omitted). Moreover, as was explained three-quarters of a century ago,

> It is a well-settled rule that, before a person can avail himself of the plea of self-defense against the charge of homicide, he must do everything in his power, consistent with his safety, to avoid the danger and avoid the necessity of taking life.... In other words, no necessity for killing an assailant can exist, so long as there is a safe way open to escape the conflict.

*Laney v. United States,* 54 U.S.App.D.C. 56, 58 (1923) (citations omitted).

In *Harper,* this court ruled that a trial court properly denied a requested self-defense instruction where a robbery victim, who had armed herself and sought out the perpetrator, confronted and then shot and killed a man she suspected of being the robber after the man lunged toward her. *Harper, supra,* 608 A.2d at 156. The court focused on the lack of any evidence of a weapon in the victim's hands. *Id.* at 155 (citing *Byrd v. United States,* 364 A.2d 1215, 1220 (D.C.1976) (self-defense instruction properly rejected where the evidence established that the victim's hand was empty at the time he was shot)). This court further grounded its affirmance in the

> well[-]established [rule] that self-defense may not be claimed by one who deliberately places [her]self in a position where [she]

has reason to believe [her] presence ... would provoke trouble.

*Id.* at 155 (internal quotation and citation omitted). This court in *Harper* concluded,

The evidence clearly showed that appellant put herself in a position that was likely to result in an escalation of tensions, and used deadly force against a man whose empty hands were in plain view.

*Id.* at 156 (citations omitted).

## III.

Applying these legal standards to the facts as Edwards himself recounted them, we conclude that, as a matter of law, he was not entitled to a self-defense instruction as to Long. When Edwards fired two shots virtually straight down into Long's body, he used excessive force—the same deadly force which killed Jackson, even though Long survived the attack.[5] At that moment, both of Long's hands were plainly visible, and did not hold any weapon. Even if we allow for a possible jury inference that Long's reaching for Edwards's legs was a threatening lunge, absent a weapon, this could not reasonably be considered a threat of imminent death or serious bodily harm. *See Harper, supra,* 608 A.2d at 155. That Edwards had seen Long with a knife earlier that day and that at that earlier time Long held the knife in his hand as he described an unrelated altercation,[6] would not be sufficient to create the immediate threat of serious bodily harm required for the use of deadly force. *See id.* at 155.

Furthermore, Edwards by no means did "everything in his power, consistent with his safety, to avoid the danger and avoid the necessity of taking a life." *Laney, supra,* 54 U.S.App.D.C. at 58. First, the potentially charged situation was created by Edwards when he attempted to dupe the West Virginian into buying soap thinking it was cocaine. As the potential for danger began to materialize—evidenced by Long's frown as he dis-

covered the sham—Edwards did not attempt to protect himself short of the attack with deadly force on Long, though many alternatives to shooting him were available to Edwards, including threatening Long or his daughter with the gun or firing a warning shot—not to mention attempting to talk to Long privately once he realized that Long "wasn't with the plan" to sell the fake drugs to the West Virginian. Finally, to the extent that Long's purported bodyguard, Jackson, posed a threat of death or serious injury to Edwards, Edwards had extinguished that threat by shooting Jackson in the head at close range. In sum, if Edwards ever had a "necessity" to use deadly force in self-defense, that necessity had certainly ended with the fatal shooting of Jackson. *See Harper, supra,* 608 A.2d at 154.

## IV.

We similarly reject Edwards's argument, based on Maryland law, that the trial court's instructions erroneously required the jury to assess Edwards's perceived threat from Jackson and Long individually, rather than the combined threat they allegedly represented to Edwards. In *Rajnic v. State,* 106 Md.App. 286, 664 A.2d 432 (Md.1995), the Maryland Court of Special Appeals ruled that the trial court erred in denying a requested instruction that read, in part:

[W]here several persons are acting together aggressively toward another, and, because of their acts or the acts of either of them, it reasonably appears to him that his life is in danger, or he is in danger of great bodily harm, he may slay any of such persons or all of them, *if it reasonably appears to him to be necessary so to do to protect himself from death or great bodily harm.*

*Id.* at 438 (emphasis added). In *Rajnic,* a group of three intoxicated men shouted and threatened the appellant, and then charged into his room to beat him. Before the men

---

**5.** " 'Deadly force' is force which is likely to cause death or serious bodily harm." *McPhaul v. United States,* 452 A.2d 371, 373 n. 1 (D.C.1982).

**6.** Contrary to Edwards's counsel's representations at oral argument and in his brief, Ed-

wards's videotaped confession does not support the statement that Long "had the knife in his hands the night of the shooting during an altercation with his girlfriend's son."

entered his bedroom, the appellant retrieved and loaded a gun stored under his bed. All three intruders were shot and killed in the ensuing struggle. *Id.* at 435.

██ Unlike the situation in *Rajnic,* Edwards faced two separate and identifiable individuals, seated apart from each other, rather than a charging group of men. The trial court did not err in instructing the jury to assess Edwards's actions against Long separately from his actions against Jackson, because, even under the language of the Maryland instruction, a defendant may not use deadly force unless "it *reasonably* appears to him to be necessary so to do to protect himself from death or great bodily harm." *Id.* at 438 (emphasis added). As the trial court here correctly noted, it

> has an obligation not to allow the jury, in sympathy or for whatever reason, to consider a defense for which there is no basis in the law. Here ... the Defendant used deadly force against a man whose ... empty hands were in plain view, that is certainly the case as to Mr. Long.

As previously discussed, by the time Edwards shot Long, Edwards no longer could reasonably believe that he faced a concerted threat from Long and Jackson, whom he had just killed.

## V.

Edwards also argues on appeal that the trial court abused its discretion in instructing the jury, with respect to the claim of self-defense against Jackson,[7] that

> [o]ne who deliberately places [him]self in a position where [he] has reason to believe [his] presence ... would provoke trouble cannot claim self-defense.

*See Harper, supra,* 608 A.2d at 155. The reasoning behind this instruction is set out in *United States v. Peterson,* 157 U.S.App.D.C. 219, 228, 483 F.2d 1222, 1231 (1973):

It has long been accepted that one cannot support a claim of self-defense by a self-generated necessity to kill. *The right of homicidal self-defense is granted only to those free from fault in the difficulty; it is denied to slayers who incite the fatal attack, encourage the fatal quarrel or otherwise promote the necessitous occasion for taking life.* The fact that the deceased struck the first blow, fired the first shot or made the *first menacing gesture* does not legalize the self-defense claim if in fact the claimant was the actual provoker.

(emphasis added) (citations omitted).

In *Peterson,* the defendant fatally shot a man after an altercation which began when the defendant caught that man stealing parts from his car. The defendant went into his house and returned with a gun, with which he warned the deceased not to move towards him. When the deceased pulled a wrench from the car and approached the defendant with the wrench raised, the defendant shot and killed him. The court stressed that

> an affirmative unlawful act reasonably calculated to produce an affray foreboding injurious or fatal consequences is an aggression which, unless renounced, nullifies the right of homicidal self-defense.

*Id.* at 230, 483 F.2d 1222 (citations omitted). The court concluded,

> the evidence plainly presented an issue of fact as to whether Peterson's conduct was an invitation to and provocation of the encounter which ended in the fatal shot.

*Id.* at 231, 483 F.2d 1222.

██ As in *Peterson,* we conclude that Edwards's attempt to sell soap instead of cocaine to Long presented at least a factual issue for the jury as to whether Edwards invited and provoked the encounter that led to the fatal shooting.[8] Edwards evidently perceived that his attempted ruse could provoke a life-threatening situation, as he armed

---

7. The government contends that the trial court erroneously instructed the jury on self-defense as to Jackson, and that we then need not address the arguments concerning the various instructional and evidentiary errors Edwards claims related to that self-defense instruction. We need not reach this issue as we conclude that the trial court did not abuse its discretion in its evidentia-ry and instructional rulings related to the claim of self-defense against Jackson.

8. We need not decide whether, as a matter of law, Edwards thereby lost his right to claim self defense. *Cf., e.g., Howard v. United States,* 656 A.2d 1106, 1111 (D.C.1995).

himself for the encounter. But for the situation that Edwards set in motion with his ruse, there is no suggestion that Long, to whom Edwards previously had sold drugs, would have made Edwards feel "like [his] life was in jeopardy," or that he would have to "shoot [his] way out" of Long's room.[9] The trial court thus did not abuse its discretion in giving the jury an instruction on provocation.

## VI.

We next address Edwards's assertions on appeal, that the trial court erred by 1) excluding evidence, unknown to Edwards at the time of the shootings, of unrelated prior acts of violence by Long; and 2) failing to instruct the jury that it could consider evidence known to Edwards about Long's prior violent acts and Edwards's opinion regarding the violent characters of Long and Jackson to resolve the reasonableness of Edwards's fears and the question of who was the aggressor.

■ We already have concluded that Edwards was not entitled to a self-defense instruction in relation to his attack on Long; thus, we address these issues only as they relate to Edwards's claim of self-defense against Jackson, as to whom Edwards did receive a self-defense instruction. We consider first Edwards's argument that he was prejudiced in presenting his theory of defense that *Jackson* was the first aggressor because Edwards was precluded from presenting some additional evidence of *Long's* violent character. We reject Edwards's premise that an issue exists as to whether Jackson "acted consistently with Long's character," based on inapposite case law which considered the admissibility of one codefendant's actions for the purpose of inferring a charged aider and abettor's intent to participate in a crime. *See Wesley v. United States,* 547 A.2d 1022, 1028 (D.C.1988).

Here, there can be no similar legal imputation of Long's intent to Jackson because, although they may have been cohorts, they were the victims, not parties charged as aiders and abettors. Edwards has cited no authority for the proposition that evidence of one person's violent inclinations may be used as factual (as opposed to legal, as in the case of aiders and abettors) evidence of that person's partner's intent.

■ We similarly find no abuse of discretion in the trial court's rejection of Edwards's request that the trial court give jury instruction 5.17(B), with respect to Jackson's general reputation for past violence.[10] That instruction explicitly concerns *"general* reputation," and as counsel for Edwards recognized at trial,

> [t]here is no testimony with respect to a reputation that they [Jackson and Long] had outside of the confines of this particular relationship. The reputation that I'm referring to is the regard with which the Defendant held both of the victims in this case. . . .

In other words, Edwards requested this instruction in relation to impressions Edwards himself held of Jackson; not of Jackson's general reputation. *Rogers v. United States,* 566 A.2d 69 (D.C.1989), which Edwards contends is controlling on this issue, simply holds that a witness may be questioned on his own opinions about a person's character, rather than just his knowledge of the person's general reputation. *See id.* at 75. *Rogers* does not rule that opinion testimony equals general reputation testimony, and therefore the trial court did not abuse its discretion in refusing to give jury instruction 5.17(B).

## VII.

Edwards also contends that the trial court erred in admitting evidence of Long's and

---

9. Edwards insisted at trial that it was these actions by Long that "initiated everything."

10. Jury instruction 5.17(B)(1), "General Reputation—Where Defendant is Aware of Reputation," reads:

> You have heard evidence about the [complainant's] [decedent's] general reputation for cruelty and violence and that the defendant knew of this reputation. You may consider such evidence as bearing on the reasonableness of the defendant's fear for his/her own health or safety. You may also consider such evidence as bearing on whether it was likely that the [complainant] [decedent] threatened the defendant with bodily harm, that is, on the issue of who was the aggressor.

Jackson's debt to Edwards from a previous drug sale because "there was no evidence that the debt was the motive for the shootings and it was too remote in time or place to be considered 'surrounding circumstances' evidence." Edwards further contends that the prosecutor committed prejudicial misconduct for arguing at closing that this drug debt was the motive for the shooting.

Edwards opposed the government's request to allow evidence of any of his prior dealings with Long. The trial court ruled pre-trial, however, that the fact that Long owed $40 to Edwards and a colleague from a prior drug sale could come in not to show Edwards's motive for shooting Long, but as "context," to explain the sale of soap for cocaine as a way to "make up" the $40 shortage.[11]

■ We agree with the trial court that evidence of the prior drug sale and debt was necessary to explain the reason for the dummy sale of soap for cocaine intended to make up the outstanding debt from the prior sale. See Johnson v. United States, 683 A.2d 1087, 1096–98 (D.C.1996) (en banc); Toliver v. United States, 468 A.2d 958, 961 (D.C.1983). Even though the prosecutor may have improperly argued that the prior drug sale provided the motive for the shootings, not just their context, the trial court properly instructed the jury as to the limited use for which the evidence was admitted, thus mitigating any possible prejudice from the prosecutor's remarks. Most important, however, is the fact that in this case Edwards's defense clearly presented him as a drug dealer who had shot the two victims in self-defense. Therefore, reference to the prior drug sale can hardly be said to have seriously prejudiced Edwards in the sense that the rule in Drew v. United States, 118 U.S.App.D.C. 11, 15, 331 F.2d 85, 89 (1964), is designed to prevent.

## VIII.

■ Finally, we address Edwards's argument that the trial court erred by failing to "explicitly find that Edwards would not benefit from youth offender treatment under the Youth Rehabilitation Act[12] or that public safety concerns justified an adult sentence." This court, sitting en banc, addressed a similar appeal in Veney v. United States, 681 A.2d 428 (D.C.1996). In that case, we concluded:

> The record in this case reflects that the judge was aware of his authority to order treatment of the defendant as a youth offender, considered that rehabilitative option, and consciously rejected it. Because, in our view, the [D.C. Youth Rehabilitation Act] requires no more than that, we now affirm.

Id. at 429. The record in this case also reflects that the trial court weighed and rejected the option of sentencing Edwards under the Youth Rehabilitation Act, thus meeting the requirements of that Act.

Affirmed.

---

11. In a bench conference held to prepare jury instructions, the trial court asked Edwards's counsel what "concept" he wished to convey to the jury with respect to the prior drug sale. Counsel replied,

> [t]hat the evidence of the drug transaction which resulted in the robbery of Long was admitted for purposes of showing the motive of

the Defendant to commit the offense, ... that the other criminal conduct which was admitted into evidence with respect to other transactions and carrying a gun other than that was to simply put everything else into context in a Toliver type situation.

12. D.C.Code § 24–801 et seq. (1996).