*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 12-CF-1152

KATRELL A. HENRY, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-17102-10)

(Hon. Lynn Leibovitz, Trial Judge)

(Argued April 3, 2014                    Decided July 10, 2014)

*Jessica Brand*, Public Defender Service, with whom *James Klein* and *Jaclyn Frankfurt*, Public Defender Service, were on the brief, for appellant.

*Susan Simpson*, Assistant United States Attorney, for appellee. *Ronald C. Machen Jr.*, United States Attorney, and *Elizabeth Trosman*, *Michael Liebman*, and *Demian S. Ahn*, Assistant United States Attorneys, were on the brief for appellee.

Before GLICKMAN and THOMPSON, *Associate Judges*, and REID, *Senior Judge*.

THOMPSON, *Associate Judge*: Appellant Katrell Henry was tried on an array of charges (first-degree murder while armed, possession of a firearm during a crime of violence, carrying a pistol without a license, and unlawful possession of a

firearm) in connection with the September 2010 fatal shooting of Laroy Bryant. The jury acquitted appellant of first-degree murder while armed and of the lesser-included offense of second-degree murder while armed, but found him guilty of the lesser-included offense of manslaughter while armed, and of the three firearm-related offenses. In this appeal, appellant argues that the trial court erred by refusing to instruct the jury that he had a right to self-defense against Bryant (an instruction that defense counsel requested notwithstanding appellant's trial testimony that he never pointed his gun at and did not shoot Bryant). We have little difficulty accepting appellant's argument that, by crediting some but not all of the government's evidence and some but not all of appellant's testimony, the jury could have found that appellant used deadly force only after he perceived himself to be in imminent danger of death or serious bodily injury. However, we conclude that nothing in the record would have permitted the jury to find that appellant reasonably believed that Bryant was about to shoot him and that he needed to shoot Bryant to protect himself from danger. Accordingly, we conclude that the evidence did not support the requested self-defense instruction and that the trial court did not err in declining to give it.

**I**.

Shortly after midnight on the morning of September 12, 2010, appellant encountered Bryant in the parking lot used by residents of the apartment building located at 2404 Hartford Street, S.E., where appellant lived. The government's evidence about what happened thereafter was presented primarily through the testimony of Joseph Nelson, another resident of the building. Nelson was pulling his car into the parking lot when he saw appellant and Bryant, realized that they were arguing, and stopped about fifteen feet away from them and rolled down his window slightly so that he could hear them. Nelson testified that he heard Bryant using profanity and loudly insulting appellant, but that he could not hear what appellant was saying in response and could not see anything in either appellant's or Bryant's hands. After appellant and Bryant separated and appellant walked toward the apartment building, Nelson saw Bryant walk over toward a group of people who were "hanging out" near some dumpsters at the far side of the parking lot. Shortly after that, appellant re-emerged, walked past his parked car, and returned to the area where he and Bryant had been arguing, but was now carrying a gun in his right hand, with the barrel pointed downward. Nelson testified that appellant and Bryant resumed arguing and, shortly after the argument had re-commenced, appellant stumbled backwards as if he had been pushed. Immediately thereafter,

Nelson saw appellant raise his gun and begin shooting at Bryant with the gun pointed downward toward Bryant's leg. Nelson testified that after appellant had fired three or four shots and after Bryant "went down," two or three of the people who were near the dumpsters opened fire, shooting toward appellant. Nelson heard appellant say, "I'm hit[.]" On direct examination, Nelson testified that appellant shot first, but during cross-examination, he agreed that he did not "know who started the shooting" and did not "know who shot first[.]" During redirect examination, however, Nelson testified that he was "[a]bsolutely sure" that appellant "shot first[,]" before the people near the dumpsters began shooting at appellant.[1]

Appellant testified during the defense case and told the jury that, weeks before the shooting, Bryant had threatened to "beat [appellant's] ass" after appellant told Tandrea Willis — who was the mother of one of appellant's children

---

[1] Forensic evidence indicated that Bryant was struck by nine bullets fired from at least two different guns and sustained a fatal shot to his chest, likely fired by a .22 caliber gun. Evidence recovered by police from the scene of the shooting included both .32 caliber and .45 caliber shell casings and bullet fragments. In a search of appellant's apartment, police found a gun box large enough to hold either a .22 caliber or .32 caliber handgun, a holster that could accommodate a .22 caliber or .32 caliber handgun, and a plastic container in which there were eight .22 caliber short cartridge casings. Police never recovered the guns used in the shooting.

and recently had become romantically involved with Bryant — about Bryant's "business . . . selling drugs in the parking lot" and about Bryant's rumored exposure to HIV. Appellant further testified that, thereafter, when he encountered Bryant, Bryant sometimes "mugg[ed] on" (i.e., made threatening faces at) him. Appellant testified that this made him "worried" and "scared," so much so that he tried to avoid Bryant, began looking for another place to live (and had already started moving his belongings by the night of the shooting), and had also started carrying a gun because he was worried about Bryant and his "boys." Appellant testified that he was not "deathly afraid" of Bryant, but explained that what made him afraid in the aftermath of his argument with Bryant was that Bryant had "little guys up underneath him" who "were scared of him" and would do "whatever he told them to do[.]"[2] Asked whether he had ever seen Bryant with any weapons, appellant told the jury that he saw Bryant shooting a gun on New Year's Eve two or three years prior to the shooting.

Turning to what happened on the night of the shooting, appellant testified that he had parked in front of his building, intending to "run in and run back out" of his apartment to "grab some money" before going to Adams Morgan to have

---

[2] Appellant testified that "whoever [Bryant was] beefing with, they [were] beefing with."

drinks with a friend. Bryant was "standing right there" as soon as he got out of his car and started "fussing and cussing" and threatening appellant.[3] Appellant testified that he had his gun with him at the time of that encounter. He further testified that, ignoring Bryant's insults, he went into his apartment, retrieved money, and then came back outside to get in his car and leave. However, when he got outside, Bryant walked toward him and called him, so he walked past his car and toward Bryant.[4] He thought that Bryant was "just going to blow some more steam" and was not afraid that Bryant would shoot him. When Bryant began "cussing and fussing" again, appellant replied that he had had "enough of . . . the bullshit[.]" Bryant reacted by pushing appellant with both hands. Appellant testified that he was going to "swing back on" Bryant but instead "went for [his] gun" (which he testified was in his pocket) because, as he fell backwards, he saw two of Bryant's "boys," who were standing near the dumpsters about 21 feet away, pull guns and begin firing. Appellant testified that he "got shot . . . and hit the ground" while still trying to get his gun out of his pocket. He testified that he eventually got the gun out while on the ground and fired three or four shots toward

---

[3] Appellant testified that "[o]ne friend was walking up towards [Bryant] after he was already there[.]"

[4] This time, according to both appellant and Nelson, Bryant was "by himself."

the individuals who were shooting at him from the dumpster area.[5]  He told the jury that Bryant had "hit the ground" seconds after he did and was already on the ground before he started shooting.  According to appellant, he never pointed his gun at Bryant, but instead pointed his gun at Bryant's "boys," in order to "save [his] life."  He asserted that it was Bryant's "boys" who actually killed Bryant.  After appellant started shooting, the "boys" fired a couple more shots and then ran away.

During a break in the trial proceedings just before appellant testified, the court asked defense counsel for an *ex parte* proffer about the defense theory of the case.  During an *ex parte* discussion at the bench, counsel told the court that appellant was "in fear of essentially the group of the decedent and the decedent's friends even though they [were] not immediately together" and that "the armed people [were] the ones who [were] by the dumpster."  Counsel told the court that appellant would not testify that Bryant was armed.  Counsel agreed that appellant was "not claiming legal justification for the shooting of the victim, other than by his right to shoot at the dumpster people."

---

[5]  Appellant testified that his gun was a .32 caliber semi-automatic handgun. He further testified that the .22 caliber cartridges found in his apartment were ones which he had had for several years and which he used, with a gun owned by his uncle, for shooting cans and bottles "down in the country."

After appellant testified, the trial court again asked defense counsel about his theory of defense. Counsel responded that the defense was alternative theories: (1) a denial that any bullet fired by appellant hit Bryant; and (2) an accident theory, i.e. (in the trial court's words), "I'm shooting at these other guys and if by some accident my bullet hit the victim, I didn't mean for that to happen." During a subsequent colloquy after the close of the evidence, defense counsel added a third theory: that "the decedent and his friends constitute[d] a group," that it was "reasonable for [appellant] to view [what was happening] as a group action[,]" and that once Bryant was aggressive toward appellant, appellant had "a right to act in self-defense against any of the people that he believe[d] [were] working together[,]" including Bryant. Counsel argued that for a self-defense instruction, it was enough if appellant had had "an actual belief that the group [was] a threat," and that there did not have to be "a belief that the individual [i.e., Bryant] pose[d] a threat[.]" The court expressed skepticism, but instructed defense counsel to clarify the defense theory in writing.

Counsel responded the same day with a written motion to instruct the jury on self-defense, which argued that appellant met the legal standard for a self-defense instruction as to the shooting of Bryant because:

The jury was presented with enough evidence that would suggest that while Mr. Bryant did not possess any firearms, that he knew that his friends were armed and that they were the deadly weapon. Indeed, a reasonable juror could have concluded that after the initial argument, Mr. Bryant ordered his "young guys" to fire their weapons after he pushed Mr. Henry. The jury could then conclude that Mr. Henry reasonably believed that shooting Mr. Bryant would end the spray of bullets directed at him. In fact, there is ample evidence that the friends indeed stopped shooting when Mr. Bryant fell to the ground.

The court's discussions with counsel on the issue of a self-defense instruction continued the next day. The prosecutor agreed that the evidence supplied a sufficient basis for the jury to receive a self-defense instruction with respect to appellant's shooting at the people near the dumpsters, but argued that the evidence did not warrant a self-defense instruction as to appellant's alleged intentional shooting of Bryant. Defense counsel argued that the jury could reasonably find that what the individuals near the dumpsters understood after Bryant went to talk to him following the initial altercation was that they "were supposed to . . . fire their guns if something physical happened between [Bryant and appellant]." And, defense counsel argued, the jury could find that after the individuals near the dumpsters pulled out their guns, appellant shot Bryant in self-defense, thinking that he could "shoot the brains and the henchmen would just run away." In other words, counsel argued, the jury could find that appellant "took out

the head of the group, in hopes that the rest of the friends would stop shooting or would not actually fire."

The court announced its ruling the next day, after reviewing transcripts of the trial testimony. The trial court said that it would instruct jurors that they "should not apply the[] instructions on self-defense to any shots you find that the Defendant fired purposely at or purposely in the direction of the Decedent." The court explained that "even on the theory that the victim was associated with a group of which [appellant] reasonably was afraid[,]" there was no evidence in the record that would allow the jury to find without speculation that appellant "reasonably concluded in the circumstances of the case that he had to kill or seriously injure the victim in order to kill or seriously injure or defend against the group" and thus "prevent the group from acting."[6] The court acknowledged that the jury could "pick and choose those facts and bits of testimony it wishes to credit," but noted that "what the jury cannot do is add facts into the record or speculate[.]"

---

[6] Expressing the point differently, the court stated that the "specific facts in this case . . . just simply don't give rise to a reasonable inference . . . by the . . . Defendant . . . that he had to kill off the victim as he was detached from the group in order to prevent the group from being a threat to him."

Consistent with its ruling the court instructed the jury as follows:

> You should apply the[] instructions on self-defense to any shots you find that the Defendant fired purposely at or purposely in the direction of the persons by the dumpster. You should not apply the[] instructions on self-defense to any shots you find that the Defendant fired purposely at or purposely in the direction of the Decedent. . . . With respect to any shots you find that the Defendant fired purposefully at the Decedent rather than purposely at the persons by the dumpster, the Government is not required to prove that the Defendant did not act in self-defense.

Appellant now argues that the trial court committed reversible error when it declined to instruct the jury that appellant had a right of self-defense as to Bryant.

## II.

"Generally, when a defendant requests an instruction on a theory of the case that negates his guilt of the crime charged, and that instruction is supported by any evidence, however weak, an instruction stating the substance of the defendant's theory must be given." *Higgenbottom v. United States*, 923 A.2d 891, 899 (D.C. 2007) (internal quotation marks and alterations omitted). This principle applies

"regardless of whether [the requested instruction] is consistent with the defense theory of the case or the defendant's testimony." *Gray v. United States*, 549 A.2d 347, 349 n.2 (D.C. 1988). The evidence supporting a requested instruction may be an amalgam of "portions . . . of the government's evidence and [portions] of the defense evidence[.]" *Hernandez v. United States*, 853 A.2d 202, 206 n.4 (D.C. 2004). The trial court must decide as a matter of law whether there is sufficient evidence to support a requested instruction, *id.* at 205 & n.4, and may decline to give the requested instruction if application of the instruction would require the jury to rely on purely speculative inferences or to engage in "bizarre reconstructions of the evidence." *Id.* at 205 n.3, 206 (internal quotation marks omitted). In reviewing the denial of a requested defense instruction, we examine the evidence in the light most favorable to the defendant. *Id*. at 205. "Failure to give an instruction embodying a defense theory that negates guilt of the crime charged, when properly requested and supported by the evidence, is necessarily reversible error." *Murphy-Bey v. United States*, 982 A.2d 682, 690 (D.C. 2009) (internal quotation marks and alteration omitted).

For a defendant charged with the use of deadly force to be entitled to a self-defense instruction, he "must have believed that he was in immediate peril of death or serious bodily harm, and that his response was necessary to save himself

therefrom." *Harper v. United States*, 608 A.2d 152, 155 (D.C. 1992) (quoting *United States v. Peterson*, 483 F.2d 1222, 1229 (D.C. Cir. 1973)) (alterations omitted). "These beliefs must not only have been honestly entertained but also objectively reasonable in light of the surrounding circumstances." *Id.*

## III.

Appellant asserts in his appellate briefs that the jury, crediting portions of Nelson's testimony and portions of appellant's testimony, could reasonably have found that appellant intentionally shot at Bryant "because he believed that Bryant" — who "had time to speak to his friends between the first and second encounters" — "had orchestrated a deadly attack with his friends and was about to join in the affray[,]" i.e., "about to start shooting" appellant. He argues that, viewed in the light most favorable to his defense, "the record supports the conclusion that [he] shot Bryant in self-defense because he reasonably believed that Bryant ordered his friends to shoot [him] and was about to start shooting as well." He contends that the trial court "impermissibly discounted" the evidence indicating that Bryant might be armed and asserts that it was "hardly a great leap for [him] to infer that

Bryant, the boys' ring leader, had also armed himself." We are not persuaded by these arguments.

We begin by noting that the argument appellant advances on appeal — that the jury could have found that he shot Bryant because he reasonably believed that Bryant was "about to join in the affray" and "was about to start shooting as well" — was not the argument defense counsel presented to the trial court.[7] As described above, in the trial court, counsel's initial argument in support of the requested self-defense instruction was that appellant had a right to shoot in self-defense at "any of the people that he believe[d were] working together." In his written motion and in a subsequent colloquy with the court, counsel argued that the jury could find that appellant was "thinking that essentially the decedent was the head, or the brains, and the friends were the actors, the operators, the henchmen" and that appellant was justified in shooting at the brains or head of the group, Bryant, so that "the henchmen would just run away" or "would stop shooting or

---

[7] As the trial court pointed out, appellant's testimony was not "I feel fearful about [Bryant] and I feel that I had to shoot [him] in self-defense, it's that I had to shoot those other guys who were by the dumpster."

would not actually fire."[8]  We nevertheless consider appellant's re-tooled

argument, because "once a claim is properly presented to the trial court, a party can

---

[8]  Appellant does not argue that the trial court erred in rejecting those arguments for a self-defense instruction, and we see no basis for finding that it did. The first of the arguments appellant presented in the trial court resembles the argument this court rejected in *Edwards v. United States*, 721 A.2d 938 (D.C. 1998).  Edwards urged this court to follow *Rajnic v. State*, 664 A.2d 432 (Md. 1995), a case in which the Maryland Court of Special Appeals held that it was error for the trial court to deny an instruction that read, in part:

> Where several persons are acting together aggressively toward another, and, because of their acts or the acts of either of them, it reasonably appears to [the defendant] that his life is in danger, or he is in danger of great bodily harm, he may slay any of such persons or all of them, if it reasonably appears to him to be necessary so to do to protect himself from death or great bodily harm.  And when a person is called upon to act under such circumstances, he is not bound to decide as to which one of the persons made the actual hostile demonstrations and refrain from injuring the others.

*Rajnic*, 664 A.2d at 438.  As we noted in *Edwards*, the facts in *Rajnic* were that after a group of three intoxicated men threatened Rajnic and then charged into his room to beat him, Rajnic retrieved and loaded a gun and shot all three intruders. We distinguished the facts in *Edwards*, which were that Edwards "faced two separate and identifiable individuals, [Long and Jackson] seated apart from each other, rather than a charging group of men." *Edwards*, 721 A.2d at 942-43.  On those facts, we held that the trial court "did not err in instructing the jury to assess Edwards's actions against Long" — "'whose empty hands [the trial court found] were in plain view'" — separately from his actions against Jackson. *Id.*  Similarly in this case, even if Bryant and the individuals who were shooting from the dumpster area more than 20 feet away were acting in concert, Bryant was (according to the evidence and as the trial court observed) "completely dissociated from the people with the guns, . . . [was] not firing, [and had] never displayed a gun[.]"  "The right of self-defense is a law of necessity," *Harper v. United States*, 608 A.2d 152, 154 (D.C. 1992) (internal quotation marks omitted); that the other

(continued…)

make any argument in the appellate court in support of that claim[.]" *Jones v. United States*, 990 A.2d 970, 981 (D.C. 2010) (internal quotation marks omitted); *see also Shelton v. United States*, 26 A.3d 216, 230 (D.C. 2009) (noting that "the distinction between a new claim on appeal and a new argument presented on appeal in support of a claim that was asserted in the trial court can be difficult to draw"). The government contends that we may reject the argument appellant presents on appeal on the ground that there was no evidence that appellant "honestly believed" that Bryant "was about to perpetrate an attack with deadly force." The government cites appellant's testimony that, as the second encounter with Bryant began, he was not afraid that Bryant would shoot him, but thought instead that Bryant was "just going to blow some more steam." There was also appellant's testimony that, even after Bryant pushed him, his intention was to "swing back" at Bryant — not the reaction of someone who believed that Bryant was armed. Nevertheless, we do not reject appellant's argument on the first basis

---

(…continued)
individuals had guns and were shooting at appellant did not give appellant a legal justification for shooting Bryant.

Nor can we find fault with the trial court's rejection of what it called the defense's "he had to kill the head to defend against the body" analogy. We agree with the trial court that, at the point when the individuals near the dumpsters pulled out their guns and began firing, appellant could not have reasonably thought that by shooting Bryant, who was not shooting at him, he could avoid being shot himself (and, as the record shows, appellant was hit by a bullet and did not avoid being shot by the individuals who were shooting from the dumpster area).

the government suggests, because our case law establishes that a self-defense instruction may be warranted if the evidence permits the jury to *infer* — rejecting defense testimony to the contrary — that the defendant's actual and honest belief was that he was in immediate peril of serious harm and that his response with a dangerous weapon was necessary to save himself from the perceived danger.[9]

Our reason for rejecting appellant's argument that he was entitled to a self-defense instruction as to the shooting of Bryant is that no evidence was presented that gave the jury a basis for finding that appellant *reasonably* believed that Bryant

_____

[9] *See, e.g.*, *Wilson v. United States*, 673 A.2d 670 (D.C. 1996), in which the defendant testified and denied that he had used a glass bottle as a weapon against the complainant transit officer. We held that a self-defense instruction was warranted because "the record, when viewed in the light most favorable to the defense, provide[d] at least some support for a finding that [the defendant] struck at [the officer,]" as the officer testified. "only . . . after [the officer] . . . violently pulled [the defendant] off the bus and forced him to the ground." *Id*. at 673. *See also, e.g.*, *Reid v. United States*, 581 A.2d 359 (D.C. 1990). There, even though the defense presented a witness who testified that he and the defendant "were playing with knives" when a police officer encountered them in an alley surrounded by other men, we held that the defendant was entitled to a self-defense instruction because "the circumstance of [his] engaging in an argument with several others while holding a knife could have indicated that [he] was outnumbered and was in the process of warding off an attack by the group." *Id*. at 367.

As the trial court observed in this case, in some circumstances "you probably don't need to testify you're in actual fear . . . to have the record suggest that you got to be concerned for your safety . . . ."

"was about to start shooting him." Not only was there no evidence that Bryant was armed; there also was no evidence that either Nelson or appellant perceived that Bryant was armed. The fact that appellant saw Bryant shoot a gun on New Year's Eve two or three years earlier did not give appellant an objectively reasonable basis for assuming that Bryant was armed, because that sighting was both remote in time[10] and not predictive of whether Bryant was a gun-toting individual in other circumstances. Appellant's belief that he was in immediate peril of death or serious bodily harm from Bryant had to be "objectively reasonable in light of the surrounding circumstances," *Harper*, 608 A.2d at 155, but the evidence of the "surrounding circumstances" was appellant's assessment before the incident in question: that there was no need to be "deathly afraid" of Bryant himself (who "fussed and cussed" and threatened to beat — but not to shoot — appellant), but there was reason to be fearful of the "little guys up underneath him," who would do his bidding. And, although there was evidence that Bryant was a drug dealer and although this court and others have acknowledged the frequent coincidence

_____

[10] Even seeing the victim with a weapon earlier the same day is not sufficient to warrant a self-defense instruction. In *Edwards*, we held that Edwards was not entitled to a self-defense instruction as to Long even though he had seen Long with a knife earlier on the day of the charged shooting and also knew that Long had used a knife during a previous altercation. *See* 721 A.2d at 942.

between guns and drugs,[11] nothing in the record suggests that Bryant's dispute with appellant or his encounter with appellant on the night of the shooting was about drugs.

We conclude for the foregoing reasons that the trial court did not err in declining to give the requested self-defense instruction. Wherefore, the judgment of the trial court is

*Affirmed.*

---

[11] *See, e.g.*, *United States v. Spaulding*, 366 F. App'x 670, 673 (7th Cir. 2010) ("[G]uns are frequently used to intimidate associates or provide security during drug deals.").