**Chidiebere P. INYAMAH, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 05–CF–593.

District of Columbia Court of Appeals.

Argued Jan. 10, 2008.
Decided Sept. 11, 2008.

Corinne Beckwith, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Peter Smith, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III, Mary B. McCord, Tejpal Chawla, and Sarah T. Chasson, Assistant United States Attorneys, were on the brief, for appellee.

Before REID and GLICKMAN, Associate Judges, and SCHWELB, Senior Judge.

REID, Associate Judge:

Appellant, Chidiebere P. Inyamah, appeals the trial court's judgment convicting him of carrying a pistol without a license ("CPWL")[1] and possession of an unregis-

---

1. D.C.Code § 22–4504(a) (2001).

tered firearm.[2] He complains that the trial court's aiding and abetting instruction constituted reversible error. We affirm the judgment of the trial court.

## FACTUAL SUMMARY

The government presented testimony from officers and employees of the Metropolitan Police Department ("MPD") showing that around 2:30 a.m. on April 22, 2004, MPD Officer Kayode Sodimu was driving a marked police car around Tenth and Quincy Streets, in the Northwest quadrant of the District, when he "heard a couple of gunshots." With him in the police vehicle were MPD Officers Vernon Copeland and Ismael Chapa.[3] As Officer Sodimu drove toward Georgia Avenue, two more shots rang out, and he saw a fast moving red car pass in front of him. Officer Sodimu activated his lights and siren and pursued the red car as the driver turned off his lights, ignored red street lights, and sped through the streets at 80 to 90 miles an hour. When the red car approached Grant Circle, the driver lost control and the car "went airborne and landed on a transformer right away." Officer Sodimu positioned his vehicle behind the red car and he watched as the passenger and driver side doors opened. The man on the passenger side, later identified as Mr. Inyamah, be-

gan to exit the car. Officer Sodimu saw a gun in Mr. Inyamah's hand and witnessed him throw the gun on the ground. Officer Sodimu went up to the car, noticed that both air bags in the red car had deployed, and he chased and detained the driver at gunpoint. While he apprehended the driver, Officers Copeland and Chapa chased Mr. Inyamah as he fled on foot.

Officer Copeland, who was seated in the back passenger seat, saw Mr. Inyamah getting out of the red car after it crashed, but the officer did not notice anything in his hand and did not see him toss anything. However, Officer Chapa testified that he "observed the passenger throw a dark object out of the vehicle"; when the prosecutor asked whether Officer Chapa "actually s[aw] the object in the possession of the passenger of the vehicle," he replied, "Yes, I did." Officer Chapa never saw the driver of the red car throw any object. Both Officers Chapa and Copeland ran after Mr. Inyamah and apprehended him. Then, Officer Chapa returned to the area where Mr. Inyamah threw the dark object. There, he "saw a black revolver laying on the ground near the car."

MPD Officers Elliott Pazornick and Karl Turner, crime scene search officers, were dispatched to Grant Circle around 3:30 a.m. on April 22.[4] Officer Sodimu showed

---

**2.** D.C.Code § 7–2502.01 (2001).

**3.** According to the government, Mr. Chapa's name is incorrectly spelled in the record as "Choppa."

**4.** Officer Pazornick was unavailable to testify at trial, but the prosecutor read his testimony from the first trial into the record. The jury in the first trial (December 2004) could not reach a verdict. Under the rule of completeness, the prosecutor also read a portion of the cross-examination testimony of Mr. Inyamah from the first trial. Mr. Inyamah maintained that the driver of the car threw the gun on his side of the car. Yet, when the prosecutor reminded Mr. Inyamah of his direct examina-

tion testimony—that he did not see the driver toss the gun—the defendant agreed: "I said I didn't see him toss the gun." Mr. Inyamah acknowledged that the air bags deployed when the red car crashed, and he stated that he "was probably a little shaken up and dazed ... [b]ut ... was not injured." In response to the prosecutor's questions, Mr. Inyamah agreed that the gun did not hit him or the air bag. Defense counsel read another portion of Mr. Inyamah's 2004 testimony, under the rule of completeness. In that portion of his testimony, Mr. Inyamah asserted that he did not see the gun and "[n]ever touched it." In contrast to his December 2004 trial, Mr. Inya-

the technicians where the gun was located. Officer Turner took pictures, and both Officer Turner and Officer Pazornick measured the distance between the red car and the revolver, determining that the gun was "[a]pproximately six feet, six inches from the [passenger side of the] vehicle."

Through Officer Chapa, the government introduced evidence establishing that Mr. Inyamah had no license to carry a pistol and no registration for a gun. Officer Chapa identified (1) an MPD sealed certificate bearing Mr. Inyamah's name and "stat[ing] that there is no record of the defendant with a certification or a registration or a certificate for a weapon in [the District][,] . . . [nor] any record of registry of ammunition to the defendant"; and (2) an MPD sealed certificate "stat[ing] that the defendant has no certificate or license to carry a pistol in the District of Columbia."

## ANALYSIS

Mr. Inyamah challenges the trial court's instruction on an aiding and abetting theory of guilt. Specifically, he asserts:

Given the critical deficiency in the government's proof that the would-be principal, [the driver of the red car], was not licensed to carry a gun, and given the prosecutor's own admission that the jury readily could have concluded that Mr. Inyamah aided and abetted [the driver's] commission of a CPWL offense, the trial court's decision to instruct the jury on an aiding and abetting theory that was irrefutably unsupported by the evidence was reversible error.

Mr. Inyamah re-emphasizes and maintains in his reply brief that both the CPWL and the possession of an unregistered firearm charges "were tainted by the government's now conceded failure to prove that the

principal, [the driver of the red car], had no license to carry a firearm and that the firearm was not registered to him." He concludes that: "The [trial] court gave an instruction that was legally incorrect, and it is easily conceivable that the jury, at the prosecutor's urging, would have convicted Mr. Inyamah on an aiding and abetting theory without realizing—as the trial court and the prosecutor also apparently did not realize—that such a conviction would require a finding that [the driver of the red car], not Mr. Inyamah, was not licensed to carry the gun and that the gun was not registered in his name."

The government agrees that "there was no evidence that the driver of the red car lacked a license to carry a pistol and, thus, [Mr. Inyamah] could not have aided and abetted the driver's commission of that crime." Nevertheless, the government maintains that "[b]ecause there was sufficient evidence that [Mr. Inyamah] committed the crime of carrying a pistol without a license and possession of an unregistered firearm as a principal, [ ] his conviction must be affirmed." The government also contends that Mr. Inyamah "conflate[s] evidentiary insufficiency with instructional error," and that he "has identified no cognizable legal defect in the aiding and abetting instruction, and his conviction must therefore be affirmed."

To provide the context for these arguments, we first focus on the pertinent part of the discussion between the trial court and both counsel pertaining to the proposed final instructions, and reiterate relevant portions of the trial court's charge to the jury. During the discussion, the prosecutor argued that an aiding and abetting instruction was proper, based in part on Mr. Inyamah's testimony from his first trial, which was read into evidence at his

mah did not testify at his second trial in March 2005, and presented no evidence.

second trial, declaring that the driver of the red car "had the gun" and Mr. Inyamah "did not touch it." Government counsel also advocated the aiding and abetting instruction because the driver fled from the police, two officers saw the defendant with the gun or a dark object, and therefore, "[i]t is reasonably inferable from those facts alone that the defendant was aiding and abetting the driver and in possession." As the prosecutor further contended:

It's possible for the jury to believe that the driver possessed [the gun] at one point and the passenger[,] the defendant[,] picked it up and threw it from the car.

Thus you can have joint possession as well as aiding and abetting that we believe are apparent on these facts.

Defense counsel took the position that the part of Mr. Inyamah's testimony from the first trial, that the defense read into the record at the second trial, did not "make[ ] out the factual basis for the instruction for aiding and abetting." Defense counsel added: "There has been no evidence that even if you did pick it up, that it was not inadvertent. I think that's one of the elements that the government needs to prove that whatever he did, he did so purposefully and knowingly."

During its brief discussion with both counsel, the trial court declared: "The jury could believe the evidence that it was the other person's gun. That's the evidence in the record. That's what [the defendant] says, that the other person had the gun.... There is also evidence that [the defendant] had the gun. There is evidence and whether you believe the evidence or not is a different situation." The trial court expressed the view that "there is sufficient evidence for the aiding and abetting instruction," and decided to repeat the instruction given during the first trial.

In instructing the jury, the trial court stated the elements of each charged crime and indicated that the government had the burden of proving each element beyond a reasonable doubt.[5] As for aiding and abetting, the trial court stated, in part:

You may find the defendant guilty of the crime charged in the indictment without finding that he personally committed each of the acts that make up the crime or that he was present while the crime was being committed.

Any person who in some way intentionally participates in the commission of a crime can be found guilty either as an aider and abettor or as a principal offender.

It makes no difference which label you attach.

A person is guilty or the person is as guilty of the crime as he would have

---

5. With regard to "the offense of carrying a pistol without a license," the trial court stated the following as elements of the crime:

Number 1. The defendant carried a pistol openly or concealed on or about his person.
Number 2. The defendant carried the pistol knowingly and intentionally....
Number 3. That the pistol was operable. That it would fire a bullet.
Number 4. The defendant was not licensed to carry the pistol by the Chief of Police of the District of Columbia.

Number 5. That the defendant carried the pistol in a place other than his home, place of business or land or premises possessed and controlled by him.
Concerning "possession of an unregistered firearm," the trial court listed the following as elements of the offense:
Number 1. The defendant possessed a pistol.
Number 2. The defendant did so knowingly and intentionally....
Number 3. The firearm was not registered to the defendant as required by the District of Columbia law.

been had he personally committed each of the acts that make up the crime.

To find that the defendant aided and abetted in committing the crime, you must find that the defendant knowingly associated himself with the commission of the crime, that he participated in the crime as something that he wished to bring about and that he intended by his actions to make it succeed. . . .

It is sufficient if you find beyond a reasonable doubt that the crime was committed by someone and that the defendant knowingly and intentionally aided and abetted in committing the crime.

 We now turn to the legal principles which will guide our discussion of the parties' arguments. " 'To obtain a conviction on a theory of aiding and abetting, the government must prove that (a) a crime was committed by someone; (b) the accused assisted or participated in its commission; and (c) his participation was with guilty knowledge.' "[6] In addition, "when parallel theories are submitted to a criminal jury antecedent to a general verdict of guilty, the verdict should be upheld as long as there is sufficient evidence to validate either of the theories presented."[7] Thus, a conviction generally is sustained under the circumstances where "two correct theories of illegality are presented in the instructions and there is sufficient evidence to convict only on one."[8] "But a jury that is given an illegal instruction cannot be assumed not to have followed it, since juries are neither authorized nor competent to make judgments of law."[9]

Here, we conclude that the trial court's aiding and abetting instruction constituted a correct statement of the law of aiding and abetting, and further, we discern no error in the court's instruction as to the elements of the charged crimes. The record shows that the aiding and abetting instruction was given under the theory, advanced by the government, that the jury could believe the driver possessed the gun at one point, but that Mr. Inyamah picked it up and tossed it our of the red car. As we explain below, we do not agree with this theory.

We would find this a closer case if the only deficiency in the evidence of aiding and abetting were the lack of evidence that the driver—the putative principal—was unlicensed and unregistered. For then, the *Griffin* presumption that the jury perceived the evidentiary weakness of the aiding and abetting theory of liability might

---

6. *Hairston v. United States,* 908 A.2d 1195, 1198 (D.C.2006) (quoting *Jefferson v. United States,* 463 A.2d 681, 683 (D.C.1983)).

7. *Leftwich v. Maloney,* 532 F.3d 20, 24 (1st Cir.2008) (citing *Griffin v. United States,* 502 U.S. 46, 60, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991)) (other citation omitted); *see also White v. United States,* 714 A.2d 115, 118 & n. 5 (D.C.1998) ("Since the jury returned a general verdict of guilty on the charge of CPWL, the conviction may be affirmed if the evidence was sufficient to support either theory" of "carrying" a pistol—actual possession, or construction possession).

8. *United States v. Black,* 530 F.3d 596, 602 (7th Cir.2008) (citing *Griffin, supra* note 7, 502 U.S. at 59–60, 112 S.Ct. 466) (other cita-

tion omitted); *see also Sochor v. Florida,* 504 U.S. 527, 538, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992) ("no violation of due process that a trial court instructed a jury on two different legal theories, one supported by the evidence, the other not.") (citing *Griffin*).

9. *Black, supra* note 8, 530 F.3d at 602. *See also Thomas v. United States,* 806 A.2d 626, 630 (D.C.2002) ("Where it appears that a conviction is based upon an improper rule of law, the verdict must be set aside.") (citations omitted); *see also Sochor, supra,* 504 U.S. at 538, 112 S.Ct. 2114 ("although a jury is unlikely to disregard a theory flawed in law, it is indeed likely to disregard an option simply unsupported by evidence") (citing *Griffin, supra* note 7, 502 U.S. at 59–60, 112 S.Ct. 466).

seem strained, given the technicality and subtlety of the defect; if an experienced trial judge and experienced counsel overlooked it, the jury might have overlooked it too. But the lack of evidence that the driver was unlicensed and unregistered was not the only defect in the evidence of aiding and abetting. Whether or not the driver had a right to possess and carry a pistol, we see no evidence that the passenger, Mr. Inyamah, helped him do it. Appellant's presence in the car, flight after it crashed, and disposal of the weapon do not add up to aiding and abetting (though the disposal does establish his guilt as a principal). That is something a jury readily could perceive as it reviewed the evidence in light of the court's legally correct instructions. In these circumstances, therefore, we think the *Griffin* presumption applies with full force: in convicting Mr. Inyamah, the jury must have found, at a minimum, that he intentionally possessed the pistol and threw it away. It is immaterial whether the jury found he had the weapon for the entire duration of the car ride or obtained it from the driver at the end of the ride; there is no evidence that the driver foisted the pistol on him against his will. The jury therefore convicted him as a principal, and the government's evidence that Mr. Inyamah acted as a principal is strong and compelling.

■ Officer Sodimu saw Mr. Inyamah throw a gun on the ground as he got out of the red car. And Officer Chapa observed Mr. Inyamah with a dark object which he threw out of the vehicle. Thus, both officers' testimony established that Mr. Inya-

mah had actual possession of the gun, because in order for Mr. Inyamah to throw it to the ground, the pistol had to have been in his hand.[10] Officers Turner and Pazornick confirmed that the gun was found approximately six feet, six inches from the red car, on the passenger side. Moreover, the government introduced documentary evidence, through Officer Chapa, that Mr. Inyamah had neither a license to carry a gun nor a registration certificate. Under these circumstances, we are satisfied that the *Griffin* principle applies.[11] Therefore, we hold that the trial court correctly instructed the jury on the law, and the evidence presented by the government was sufficient, beyond a reasonable doubt, to convict Mr. Inyamah of the charged crimes as a principal. *Griffin, supra.*

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*

■

---

10. *See Campos v. United States,* 617 A.2d 185, 187 (D.C.1992) ("A defendant who maintains direct physical control over an object at a given moment has actual possession of such object.").

11. In *Hairston, supra* note 6, though we declined to consider a similar point because the government had not raised it, we observed

that "in a case such as this, an argument could be made that a jury will likely disregard a factually unsupported theory of liability—here accomplice liability—in favor of one [principal liability] clearly supported by the evidence...." 908 A.2d at 1200 (citing *Griffin,* 502 U.S. at 59–60, 112 S.Ct. 466).