*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CF-331

GARY C. DICKENS, APPELLANT,

v.

UNITED STATES, APPELLEE,

and

No. 14-CF-425

ANTWARN D. FENNER, APPELLANT,

v.

UNITED STATES, APPELLEE.

07/20/2017

FILED
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeals from the Superior Court
of the District of Columbia
(CF3-9198-10 and CF1-9270-09)

(Hon. Jennifer M. Anderson, Trial Judge)

(Argued March 16, 2017                    Decided July 20, 2017)

*Jenifer Wicks* for appellant Gary C. Dickens.

*Mikel-Meredith Weidman*, Public Defender Service, with whom *Samia Fam*, Public Defender Service, was on the brief, for appellant Antwarn D. Fenner.

*Stephen F. Rickard*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney, and *Elizabeth Trosman*, *John P. Mannarino*,

*Joycelyn Ballantine*, and *David Gorman*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN, FISHER, and THOMPSON, *Associate Judges*.

Opinion for the court by *Associate Judge* FISHER.

Separate statement of *Associate Judge* FISHER at page 31.

FISHER, *Associate Judge*:  A jury convicted appellants Antwarn Fenner and Gary Dickens of first-degree murder while armed[1] and conspiracy to commit the same.[2]  Mr. Fenner argues that the trial court committed reversible error when it instructed the jury on the principles of aiding and abetting and when it struck a small portion of his closing argument.  Mr. Dickens argues that he should receive a new trial under Super. Ct. Crim. R. 33 and the doctrine of *Brady v. Maryland*[3] due to the government's alleged failure to disclose a statement made by a witness during the preparation of a presentence report.  He also argues that we should remand for further inquiry regarding a complaint he made about his counsel before trial began.  We affirm.

---

[1]  D.C. Code §§ 22-2101, -4502 (2012 Repl.).

[2]  D.C. Code § 22-1805a (2012 Repl.).

[3]  373 U.S. 83 (1963).

## I.     Factual and Procedural Background

On August 8, 2008, Stanley Daniels—the victim in this case—was sitting in a Range Rover parked next to the intersection of Georgia Avenue and Newton Place, N.W.  Daniels had been the boyfriend of April Dickens, who had been murdered by repeated stabbing a month earlier.  Although appellant Dickens was April's ex-husband, he and April had had sex the day before she died.  Dickens told the investigating detective that he was "100 percent sure" that Daniels had killed April.  The detective recovered Daniels' jeans and boots, which appeared to have blood on them.  Later DNA testing, completed after Daniels' death, confirmed that the blood belonged to April.

The detective testified that appellant Dickens had been "upset" with the length of time required to investigate his ex-wife's death and that he "was crying to the point where I told him . . . don't do anything rash."  Witnesses had warned the detective that Dickens had stated his intent to kill Daniels.  Dickens also told his nephew, Eddie Pitts, that he wanted to buy a gun to kill Daniels.

On the night of August 8, Eddie Pitts was with an acquaintance, Tyrone Johnson, when he saw Daniels in the Range Rover.  Pitts borrowed Mr. Johnson's

cell phone to make two calls.  After the first call, Pitts asked Johnson if he had a gun.  Johnson replied that he did not.  Pitts explained that "there was a guy across the street . . . that did something to his folks[.]"  During the second call, Johnson overheard Pitts loudly and anxiously saying, "[W]here y'all at?  Hurry up."  The record shows that two calls were placed from Johnson's phone to one of Dickens' residences around this time.

At likely the same approximate time,[4] a friend and relative of Dickens stopped by the residence and, at Dickens' request, drove Fenner from the residence to a carryout restaurant near Daniels' location.  Dickens and Fenner were "like brothers"; Fenner was Pitts' cousin.  The friend testified that Fenner was wearing a white t-shirt and jean shorts.

Dickens called Crystal Jackson, who was then his girlfriend, and hurriedly asked her to look after the children.  According to Ms. Jackson, Dickens explained that Fenner had just been on the phone with Pitts, who had told Fenner that Daniels was in the Range Rover.[5]  Ms. Jackson met Dickens on a side street near Georgia

---

[4]  The witness could not remember the exact date.

[5]  Pitts testified that he spoke with Dickens, not Fenner, during each of his phone calls.

Avenue, where Dickens had driven with his niece and her friend. Ms. Jackson picked up keys from Dickens and left. Dickens, Fenner, and Pitts were all near the area where Daniels was sitting in the Range Rover.

At this point, the testimony of two witnesses differs somewhat. Mr. Johnson testified that Fenner came up to him and Pitts. Pitts told Fenner that Daniels was in the Range Rover. Fenner asked Pitts "which way could [Fenner] go and where [Pitts] was going to pick him up . . . after [Fenner] was done." Fenner then asked where a nearby alley led, and he walked towards it. About five minutes later, Fenner exited the alley, crossed the street, and fired several shots into the driver's side of the Range Rover from a few feet away. Pitts had since left and walked down another street. After the shooting, Fenner went back through the alley from which he had come. Johnson testified that he did not see Dickens that night.

Pitts testified that Dickens walked up to Johnson before the shooting and then spoke with Johnson and Pitts. Dickens asked where Daniels was, and Pitts pointed to the Range Rover. Pitts agreed to "go over on the corner and pick [Fenner] up" after the shooting. Fenner arrived. Dickens crossed the street

towards the vehicle and identified Daniels by nodding his head.  Pitts went to get his car so he could pick up Fenner.

Steve Broido was driving on Georgia Avenue when he heard gunshots and saw bright flashes.  He told a 9-1-1 dispatcher that the shooter was wearing a white shirt and blue jean shorts.  Another witness, Juan Castillo, was standing about a block away from the shooting.  He testified that the shooter was wearing a light gray shirt and dark jean shorts.  He also remembered the shooter as having short, "[a]lmost bald" hair, facial hair on his chin and jawbone area, and dark skin.

Police found Daniels in his Range Rover, dead from several gunshot wounds.  An expert in firearms and tool mark identification testified that the evidence indicated that the same weapon had fired all of the shots.

After the shooting, Pitts picked up Fenner, who told him that Dickens was still "up there."  Using cell phone records and maps created as part of his analysis, an expert in radio frequency engineering later confirmed that Dickens' phone transmitted several calls from the area during this time.  Fenner also told Pitts that he had shot Daniels, whose "brains [had flown] in the backseat of the car."  The two men went to a strip club that was known to search customers at the door.

After they left the club, Fenner reached under Pitts' car seat and pulled up a gun, which he concealed in the waistband of his pants. When they arrived at Pitts' home, Fenner hid the gun under a bush and left with his girlfriend.

When Ms. Jackson saw Dickens again later that night, he told her that he had been on Georgia Avenue and had walked up to Daniels' car. Dickens also came to Pitts' house the next day and bragged that he had told his children that he "was going to get that dude that killed their mother." At a cookout later that day, Jessie Lawrence, a cousin of Dickens and Fenner, heard Fenner confess that he had shot Daniels "numerous times," including in the head.

Fenner, Dickens, and Pitts were all charged with first-degree murder while armed and conspiracy to commit that offense. Fenner was also charged with possession of a firearm during a crime of violence ("PFCV"). About a year before the trial of Fenner and Dickens, Pitts pled guilty to one count of conspiracy to commit murder. Fenner and Dickens chose to go to trial, where the government called several witnesses, including Pitts.

After its case-in-chief, the government requested an aiding and abetting instruction. Fenner's counsel argued that the instruction should apply only to

Dickens because "the evidence is so clearly and conclusively that it's my client that's the principal and [that Dickens is] the aider and abettor." The trial judge decided to give a general aiding-and-abetting instruction that would apply to both defendants because "nobody has testified that they . . . can identify the shooter," and a "reasonable juror could find . . . that even if Mr. Fenner was not the shooter, he was an aider and abett[o]r" because "the murder was ongoing until they left the scene." The court noted the potential discrepancy between Johnson's identification of Fenner and the testimony of Castillo, who had described a shooter with physical characteristics that arguably better matched Dickens, who had darker skin than Fenner and more facial hair. Indeed, after the court's ruling, Fenner's counsel argued to the jury that Dickens was the shooter.

During its deliberations, the jury asked (1) whether a defendant had "to have a gun in hand" to have committed first-degree murder while armed, and (2) whether the causation element of the offense referred to just "strictly . . . shooting Stanley Daniels" or could also "mean any act that leads to the death of Stanley Daniels." The trial judge answered the first question in the negative. Responding to the second question, the judge told the jury that it could find a defendant "guilty of first-degree murder while armed either because you are convinced beyond a reasonable doubt that the defendant committed each and every

element or because you are convinced beyond a reasonable doubt that a defendant aided and abetted another individual who committed that offense."

The jury convicted Fenner and Dickens of conspiracy and murder. However, it acquitted Fenner of PFCV.

## II. Analysis

### A. Aiding and Abetting

Appellant Fenner argues that the trial judge should have told the jury that the aiding and abetting instruction did not apply to him. He asserts that the government's evidence tended to show that he was the principal—the shooter—and that there was insufficient evidence that he acted as an aider or abettor. He also points to his acquittal of PFCV as proof that the jury did not believe he was the gunman, leaving only an inappropriate aiding-and-abetting instruction to explain his conviction of first-degree murder while armed.

"We review the trial court's decision to give a requested jury instruction for abuse of discretion, viewing the instructions as a whole," and considering "the

record in the light most favorable to [the requesting] party." *Washington v. United States*, 111 A.3d 16, 23 (D.C. 2015) (internal quotation marks omitted). "[T]he central question for this court is whether [the instruction] is an adequate statement of the law, and whether it is supported by evidence in the case." *Id.* (alterations in original). Fenner does not assert that the instruction stated the law of aiding and abetting incorrectly, but rather that the jury would have had "to engage in an irrational or bizarre reconstruction of the facts" to apply that legal principle to him. *See Brooks v. United States*, 599 A.2d 1094, 1099 (D.C. 1991).

In the District of Columbia "all persons advising, inciting, or conniving at the [criminal] offense, or aiding and abetting the principal offender, shall be charged as principals and not as accessories[.]" D.C. Code § 22-1805 (2012 Repl.). "[T]he elements of aiding and abetting are" that (1) "a crime was committed by someone," (2) "the accused assisted or participated in its commission," and (3) "his participation was with guilty knowledge." *Tann v. United States*, 127 A.3d 400, 439 (D.C. 2015) (quoting *Hawthorne v. United States*, 829 A.2d 948, 952 (D.C. 2003)). In order for this theory of liability to apply, there must be joint criminal activity. "One cannot aid or abet himself." *Brooks*, 599 A.2d at 1099 (internal quotation marks and emphasis omitted). "[T]o aid or abet another to commit a crime, it is necessary that a defendant in some sort

associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." *Id.* (internal quotation marks omitted).

Fenner largely relies on *Brooks*, where this court held that it was reversible error to give an aiding and abetting instruction. We reasoned: "That the man who burglarized the premises may have had an accomplice . . . does not convert him into the aider or abettor; rather, it tends to identify him as the principal who was aided or abetted by another." *Id.* at 1100. We concluded that "Brooks was either the principal or a non-participant. There is no evidentiary predicate for finding that he was an aider or abettor." *Id.*

In addition to distinguishing the case factually, the government argues that the holding in *Brooks* has been undercut by more recent decisions of the Supreme Court and this court. In *Griffin v. United States*, 502 U.S. 46 (1991), the Supreme Court considered a challenge to a general verdict of guilty. The instructions had permitted the jury to convict on "*either one* of the two objects of the conspiracy," but the evidence connected Griffin to only one of those objects. *Id.* at 48 (emphasis in original). The Court upheld the verdict, reasoning that the chance was "remote" that "the jury convicted on a ground that was not supported by

adequate evidence when there existed alternative grounds for which the evidence was sufficient." *Id.* at 59-60 (quoting *United States v. Townsend*, 924 F.2d 1385, 1414 (7th Cir. 1991)).

The Supreme Court stressed that jurors may not be "equipped to determine whether a particular theory of conviction submitted to them is contrary to law," but "[q]uite the opposite is true . . . when they have been left the option of relying upon a factually inadequate theory, since jurors *are* well equipped to analyze the evidence[.]" *Griffin*, 502 U.S. at 59. It held that, although the trial court could, in its discretion, give an instruction "eliminating . . . an alternative basis of liability that does not have adequate evidentiary support," its "refusal to do so . . . does not provide an independent basis for reversing an otherwise valid conviction." *Id.* at 60.

We have applied the principles of *Griffin* to the aiding and abetting context. In *Inyamah v. United States*, 956 A.2d 58 (D.C. 2008), the appellant was convicted of carrying a pistol without a license. There was "strong and compelling" proof that the appellant had possessed and discarded the pistol, *id*. at 63, but little, if any, evidence that he had acted to aid or abet his companion in carrying the weapon. He argued that "the trial court's aiding and abetting instruction constituted

reversible error" because the evidence did not support that theory of liability. *Id*. at 59-60.

We rejected this argument, holding instead "that the *Griffin* principle applies." *Inyamah*, 956 A.2d at 63; *see also id.* at 62 ("[A] conviction generally is sustained . . . where two correct theories of illegality are presented in the instructions and there is sufficient evidence to convict only on one." (internal quotation marks omitted)). We stressed that "we [did] not agree with" the government's aiding and abetting theory, but were satisfied that the "jury . . . convicted him as a principal[.]" *Id.* at 62-63.

Fenner responds that his acquittal of PFCV rebuts the presumption endorsed in *Griffin*. *See Inyamah*, 956 A.2d at 63 (referring to "the *Griffin* presumption"). We need not resolve this debate. Even if it were necessary to find a factual predicate for characterizing Fenner as an aider and abettor, the evidence was sufficient in this case. First, Dickens had a powerful motive to kill Daniels and stated his intention to do so numerous times, he was present at the scene of the crime, he approached the Range Rover in which Daniels was sitting, and his physical characteristics more closely matched Mr. Castillo's description of the shooter. Indeed, Fenner argued to the jury that Dickens was the shooter.

Second, there was evidence that Fenner "assisted or participated in" Daniels' murder even if Dickens ultimately pulled the trigger. *See Tann*, 127 A.3d at 439. A jury could reasonably infer that the two men coordinated before the shooting. According to Ms. Jackson, Dickens told her that Fenner had learned of Daniels' location, implying that Fenner and Dickens had discussed the subject that night. Dickens then arranged for Fenner to travel to the scene. Mr. Johnson testified that once Fenner arrived, Fenner spoke with Pitts about where he could go after the shooting. Pitts confirmed that he agreed to "pick [Fenner] up" after Daniels was murdered.

Even if the jury was unsure whether Fenner and Dickens had decided at this point who would shoot Daniels, it could infer that Fenner was seeking to make the venture succeed by encouraging Dickens; traveling to the scene at his request; providing any assistance that Dickens would need, including as a lookout; and then fleeing with Dickens and/or the weapon if necessary. This view of the evidence would make sense because the two men were "like brothers." Indeed, Pitts testified that Fenner fled with him after the shooting and that Fenner had a gun, which he later attempted to hide.

This entire course of conduct would be sufficient to find aiding and abetting. *See, e.g.*, *Johnson v. United States*, 883 A.2d 135, 142 (D.C. 2005) (holding that there was sufficient evidence of aiding and abetting where the defendant "was not 'merely present'" but "gave tacit approval to all of the offenses perpetrated by [Lewis], . . . [and] could have disassociated himself from Lewis at several points during the sequence of events, but failed to do so; and . . . displayed his consciousness of guilt by fleeing from the police and attempting to conceal himself in some bushes"); *Gayden v. United States*, 584 A.2d 578, 582-83 (D.C. 1990) (there was sufficient evidence to support instruction on aiding and abetting where the defendant "traveled to the scene of the crime[,] . . . was present at the killing[,] and . . . fled the scene with [two possible killers]"); *Settles v. United States*, 522 A.2d 348, 358 (D.C. 1987) (there was sufficient evidence of aiding and abetting where the defendant was potentially a lookout and "was with Settles before the crime, was present during the crime, and fled with Settles after the crime" because the defendant "must have had actual knowledge that a crime was being committed, but . . . he did nothing to disassociate himself from the criminal activity").

Finally, the jury could have inferred Fenner's guilty knowledge from all of the circumstances described above. Indeed, the jury convicted Fenner of conspiracy, providing powerful evidence that it believed that the government had

proven the requisite intent for aiding and abetting as well. *See Wheeler v. United States*, 977 A.2d 973, 982-84 (D.C. 2009) (holding that an aiding and abetting instruction that did not set forth the correct requirement of intent was harmless because "the jury, in convicting of conspiracy to murder, unanimously found the higher, requisite intent for premeditated murder because a conspiracy to murder could hardly involve any lesser intent").

Even if there needed to be a factual basis for concluding that Fenner was not the shooter, but an aider and abettor, there was such a predicate here. Thus, Fenner does not show any error by the trial court in giving the aiding and abetting instruction.

## B. Mr. Fenner's Closing Argument

We also reject Fenner's argument that the trial court committed reversible error by striking a small portion of his counsel's closing argument. At the beginning of his argument, Fenner's counsel told the jury that his client was presumed to be innocent, that the government bore the burden of proof beyond a reasonable doubt, and that the defense was not required to present any evidence. When counsel urged, "[I]f there are questions you want answered, like about this

investigation, witnesses you wish you heard from, like the other people supposedly up there in the car with [Dickens], evidence you wish you had, fingerprints [or] DNA[,]" he was interrupted by an objection. This comment apparently referred in part to Dickens' niece and her friend, who were not called to the witness stand by the government. The trial court told the jurors they should "ignore that one argument about people that were up there that you didn't hear from."

Fenner relies upon *Greer v. United States*, 697 A.2d 1207, 1210 (D.C. 1997), for the proposition that he was not making an incomplete missing witness argument, but was attempting to point out the lack of evidence to corroborate the government's theory. Whether or not the court should have stricken the argument, appellant's counsel went on to argue at length, attacking the credibility of the government's witnesses, highlighting the conflicting descriptions of the shooter, and emphasizing that the government bore the burden to prove appellant's guilt beyond a reasonable doubt. He ended by reminding the jurors that reasonable doubt could be based on the "lack of evidence in the case" and asserted that there was "absolutely no physical or scientific evidence connecting Mr. Fenner [to] this murder. No shell casings, no DNA, no fingerprints, nothing." Thus, counsel made the argument endorsed in *Greer*, and there was no abuse of discretion. *See, e.g.*, *Haley v. United States*, 799 A.2d 1201, 1207 (D.C. 2002) (stating that "a trial court

has broad discretion in controlling the scope of closing argument," and an abuse of discretion is found when "the court prevents defense counsel from making a point essential to the defense").

## C. The Presentence Report for Pitts

Dickens argues that he should receive a new trial because a statement that Pitts made to the Court Services and Offender Supervision Agency ("CSOSA") in connection with his own presentence report ("PSR") was not disclosed until after trial. He relies on both *Brady v. Maryland* and Super. Ct. Crim. R. 33.

After Pitts pled guilty to conspiracy, a Community Supervision Officer ("CSO") at CSOSA was assigned in January 2011—approximately seven months before Dickens and Fenner were tried—to conduct a presentence investigation of Pitts. Two days later, the prosecutor emailed Pitts' counsel stating that she did not "want to get in the way of [Pitts'] PSR being completed in a timely fashion," but "ask[ing] you and [Pitts] to keep in mind that any statement that he provides will have to be made available to the defense in our upcoming trial and will provide fodder for his cross examination." The prosecutor stressed that she would be "carefully examining [the] statement, as will the court at sentencing, to determine

whether [Pitts] has fully accepted responsibility for his role in the conspiracy to murder Stanley Daniels."

The CSO interviewed Pitts on February 15, 2011, without notifying his attorney or the prosecutor. Pitts made several statements that minimized his involvement in the conspiracy and contradicted statements he later made at trial. The day after the interview, by coincidence, Pitts' attorney left a voicemail for the CSO asking her to halt her investigation because Pitts was going to move to continue his sentencing. The CSO halted preparation of the PSR. The CSO did not tell the prosecutor or Pitts' attorney that she had conducted the interview, and Pitts' statement was not made available until the report was completed on September 14, 2011.

At a June 2011 status hearing in Pitts' case, the judge briefly inquired about the CSO's investigation. Pitts' attorney reported that Pitts had "spoken to" the CSO but that she had asked the CSO not to prepare the PSR yet because Pitts would be testifying at the trial of Fenner and Dickens. Pitts' attorney also said that she "believe[d]" that the CSO had "done all of her work," but she confirmed that the PSR had "not been prepared yet." The prosecutor was present during these remarks.

Fenner's counsel moved to unseal the transcripts and PSR in Pitts' case. At a July status hearing in the case against Dickens and Fenner, the prosecutor did not object to unsealing the transcripts, but she noted that the CSO had not yet completed her investigation. Regarding the PSR, she stated that she did not know "what the status on that front is." The presiding judge granted Fenner's motion to unseal the transcripts but did not grant Fenner's request for access to the PSR, stating that if the defense "want[s] to file something on the [PSR] issue, you can do that." Dickens' counsel was present during this exchange. Neither Fenner nor Dickens raised the issue again before trial.

After trial, the CSO completed the PSR and submitted it to the court. The prosecutor received it shortly thereafter and saw Pitts' February 2011 statement for the first time. She then requested that the CSO contact Pitts' attorney so that Pitts could give a supplemental statement. Pitts' attorney arranged for her client to return to the CSO's office to give a supplemental statement. After receiving permission from the presiding judge, the prosecutor disclosed to appellants' counsel the PSR containing both Pitts' original and revised statements.

Fenner and Dickens both moved for a new trial, citing Super. Ct. Crim. R. 33 and *Brady v. Maryland*. The trial judge denied those motions, reasoning that the government did not suppress the PSR because it did not possess it and that, in any event, the statements were not material because Pitts was extensively impeached at trial and any further impeachment based on the PSR would have been cumulative. On the Rule 33 issue, the trial judge found that appellants had not been diligent in trying to obtain the statements and that they could not show prejudice for the reasons stated in her *Brady* analysis.

Whether the government has violated its *Brady* obligations is a mixed question of fact and law. *Mackabee v. United States*, 29 A.3d 952, 959 (D.C. 2011). We "review the trial court's legal conclusions on a *de novo* basis and its factual findings under the clearly erroneous standard." *Id.* (alterations omitted) (quoting *Miller v. United States*, 14 A.3d 1094, 1120 (D.C. 2011)). Appellant has the burden of proving the three components of "a true *Brady* violation": "(1) the evidence at issue must be favorable to the accused either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) prejudice must have ensued, meaning that the suppressed evidence must have been material." *Id.* (alterations and internal quotation marks omitted). As part of the second requirement,

appellant must show that "the information was actually in the government's possession[.]" *Bellinger v. United States*, 127 A.3d 505, 520 (D.C. 2015).

Dickens does not appear to assert that the government had actual possession of Pitts' statement at the time of trial. Instead, he argues that "the government can be fairly charged with knowledge of the existence of Pitts' February 15, 2011 statement" given that Pitts' counsel stated at the June status hearing that she believed that the CSO had "done all of her work[.]" Therefore, Dickens argues, the government should have searched for and acquired the statement (or the CSO's rough notes) and then disclosed the information to him. Dickens also claims that this alleged duty has particular force in this case because "CSOSA was acting in an investigatory manner such that they should be deemed agents of the prosecution for *Brady* purposes."

It is true that the prosecution "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). When we have examined whether an entity was acting on behalf of the government in similar contexts, we have asked whether that entity was part of the "prosecution team." *See Myers v. United States*, 15 A.3d 688, 692 (D.C. 2011) (analyzing whether a WMATA video

recording was in the government's possession for purposes of Super. Ct. Crim. R. 16). Although Dickens acknowledges that CSOSA is not "formally" a member of the prosecution team, he nonetheless insists that we should treat its employees as "agents of the prosecution."

The record does not support this claim. First, as the trial court explained, CSOSA undertakes investigations in order to "assist the court in sentencing defendants," not to prosecute them. Indeed, statutory provisions and Superior Court rules emphasize that the court has ultimate control over the PSR process. *See* D.C. Code § 23-103 (a) (2012 Repl.) (providing that "before imposing sentence *the court* may disclose to the defendant's counsel and to the prosecuting attorney, but not to one and not the other, all or part of any pre-sentencing report submitted to the court" (emphasis added)); Super. Ct. Crim. R. 32 (b)(1)(A) (requiring CSOSA to "make a presentence investigation and report to the court before the pronouncement of the sentence"); Super. Ct. Crim. R. 32 (b)(2)(D) (requiring the PSR to include certain information, including "such other information as may be required *by the court*" (emphasis added)); Super. Ct. Crim. R. 32 (b)(3)(A) (establishing that "[*t*]*he court* must make available to the defendant through the defendant's attorney and to the attorney for the government a copy of

the [PSR]" (emphasis added)).[6] Further, the prosecutor had to ask the court's permission to disclose the PSR to appellants, further highlighting the control that the court, and not the prosecution, has over its disclosure.

In addition, even if the prosecutor should have known that Pitts had given a statement to the CSO,[7] the government in this case did not have knowledge of the

---

[6] The analogous federal rule contains similar provisions. *See* Fed. R. Crim. P. 32 (c)-(e). Federal courts have consistently declined to find *Brady* violations when the defendant alleges that the government failed to acquire and turn over presentence reports. *See, e.g.*, *United States v. Rivera-Rodriguez*, 617 F.3d 581, 595 (1st Cir. 2010) (holding that there was no *Brady* violation because the cooperator's "sentencing-related testimony was maintained by the probation officer preparing the PSR, and there is no evidence that the federal prosecutor or any agent working on the U.S. Attorney's behalf had this information prior to or during trial"); *United States v. Zavala*, 839 F.2d 523, 528 (9th Cir. 1988) (holding that disclosure of "statements of various government witnesses in their probation reports" was not required by *Brady*, the Jencks Act, or Rule 16 because "the probation department ha[d] control of all the reports"); *United States v. Trevino*, 556 F.2d 1265, 1270 (5th Cir. 1977) (holding that there were no *Brady* violations in failing to disclose presentence report of principal government witness who had pleaded guilty because Rule 32 "shows that the presentence report is a report *to the court*, compiled for the court's use in the sentencing process" (emphasis in original); "a presentence report serves not as a prosecutorial tool but as an informative document for the guidance of the court"); *United States v. Dingle*, 546 F.2d 1378, 1381 (10th Cir. 1976) (holding that *Brady* "does not apply to a presentence report because the report is not available to the prosecution. It is not submitted to or in the possession of the government."). Dickens cites *United States v. Burnside*, 824 F. Supp. 1215 (N.D. Ill. 1993), and *United States v. Safavian*, 233 F.R.D. 12 (D.D.C. 2005), in support of his arguments, but these decisions are not binding on us, and we do not find them persuasive.

[7] At that stage, Pitts' counsel had merely represented that Pitts had "spoken

(continued…)

PSR or access to it superior to Dickens' counsel. The government did not know the content of the report until it was able to access the PSR after trial. Thus, it had no reason to think that Pitts had made any statements that might have exculpated Dickens. Further, both the prosecutor and Dickens' counsel were present when Fenner argued that he should have access to the notes before trial, even though the prosecutor did not have them. The trial court responded by inviting "the defense" to file a motion explaining why "they" should receive them. Dickens' counsel could have filed that motion even if Fenner did not. Instead, neither Dickens nor Fenner raised the issue again before trial.

Although there might be circumstances in which the government could be found to be in constructive possession of materials in the hands of CSOSA, those circumstances are not presented here. Accordingly, the government did not fail in its *Brady* obligations.[8] Because the PSR statement was not in the government's

_____

(…continued)
to" the CSO and that she "believe[d]" that the CSO had "done all of her work" but that the PSR had "not been prepared yet." Thus, at the July status hearing, the prosecutor informed the court that she did not know "what the status on [the PSR] front is."

[8] Dickens highlights the prosecutor's email to Pitts' counsel asking that she and Pitts "keep in mind that any statement that [Pitts] provides will have to be made available to the defense[.]" This curious remark cannot fairly be treated as a concession that the *Brady* doctrine would require the prosecutor to disclose a

(continued…)

possession at the time of trial, we need not reach the issue of its materiality. *See, e.g.*, *Guest v. United States*, 867 A.2d 208, 211-12 (D.C. 2005).

We apply similar analysis to Dickens' argument under Rule 33. To receive a new trial based on newly discovered evidence, Dickens must show that: "(1) the evidence is newly discovered; (2) the moving party was diligent in seeking to obtain the evidence; (3) the evidence is material to the issues involved and not merely cumulative or impeaching; and (4) it is of a nature that it would probably produce an acquittal." *Ingram v. United States*, 40 A.3d 887, 901 (D.C. 2012) (quoting *Porter v. United States*, 826 A.2d 398, 414 (D.C. 2003)). We review a trial court's decision to grant or deny a motion for a new trial to determine whether it has committed an abuse of discretion. *Ingram* at 902.

Here, Dickens fails to meet the second requirement because he was not diligent in seeking out Pitts' statement to the CSO. As already noted, the trial court invited "the defense" to file a motion to obtain access to the CSO's notes

---

(…continued)
statement she did not possess. Moreover, as the trial judge stated, there is "nothing nefarious" about deferring preparation of the PSR in this context because "the government has a legitimate interest in postponing sentencing until a time when it can make a sentencing recommendation that reflects the extent of the codefendant's cooperation." Mr. Pitts had a similar interest in postponing his own sentencing until he had fulfilled his commitments under the plea bargain.

before trial. Dickens did not do so even though his counsel was present when the trial judge made this ruling. Thus, he did not diligently try to obtain the evidence, and he cannot now complain that he should receive a new trial because the evidence was newly discovered.[9]

### D. Mr. Dickens' Complaint About His Counsel

Dickens also argues that we should remand for further inquiry regarding a complaint that he made before trial about his counsel, Kevin McCants. Fenner requested a continuance of the trial, a motion which Mr. McCants opposed but the court granted. At the next hearing, Mr. McCants told Judge Thomas J. Motley, to whom the case was then assigned, that Dickens had been informed by a third party that Mr. McCants had "caved in" regarding the continuance and that "[b]ased on that—and there may be other matters—he's decided that he wants to get rid of me off of this case. At least he wants the Court to appoint him a new lawyer."

Judge Motley repeatedly emphasized that he, too, had "wanted to keep that trial date" but felt compelled to grant the continuance because of medical issues

---

[9] Because appellant's argument fails on this prong, we need not reach the government's alternative arguments that the evidence was merely impeaching and that it was not likely to produce an acquittal.

facing the mother of Fenner's counsel. The court also wanted to try the cases together. Thus, as a practical matter, Mr. McCants would not have been able to prevent the postponement of Dickens' trial. Judge Motley concluded that "[i]f that's the only issue of the relationship, I can't appoint him new counsel because you couldn't get the date changed." Mr. McCants confirmed that he and Dickens had a "great relationship" aside from the continuance issue. Mr. McCants represented Dickens at trial.

On appeal, Dickens complains that the trial court did not make any inquiry of him personally, nor did it investigate his counsel's comment that "there may be other matters" relevant to Dickens' reported dissatisfaction. "When a defendant makes a pretrial challenge to the effectiveness of counsel . . ., the trial court has a constitutional duty to conduct an inquiry sufficient to determine the truth and scope of the defendant's allegations." *Monroe v. United States*, 389 A.2d 811, 820 (D.C. 1978). That inquiry "is necessarily dependent upon the circumstances presented in each individual case, and thus must be committed to the sound discretion of the trial court." *Portillo v. United States*, 62 A.3d 1243, 1252 (D.C. 2013) (quoting *Monroe*, 389 A.2d at 821).

The trial court did not abuse its discretion when conducting its inquiry. Mr. McCants' remarks made clear that Dickens' main, and possibly only, complaint was his belief that Mr. McCants "caved in" regarding the continuance. Judge Motley engaged in a lengthy discussion with Mr. McCants in which he repeatedly stressed that the trial date had to be moved due to unavoidable circumstances regarding the mother of Fenner's counsel.[10] Thus, the record demonstrates that Mr. McCants' failure to prevent the continuance was not evidence of ineffectiveness.

We reject Dickens' argument that Judge Motley abused his discretion by not probing further into Mr. McCants' passing comment that "there may be other matters." Once the trial court completed its inquiry into Dickens' specific complaint, it was not required to investigate such a fleeting and vague reference. *See, e.g.*, *Forte v. United States*, 856 A.2d 567, 574, 576 (D.C. 2004) ("[T]he court need not attempt to examine every conceivable deficiency in the representation,"

---

[10] Dickens' appellate counsel claims that Dickens was not present during this colloquy. Dickens was in the courtroom and unshackled, but the colloquy took place at the bench. It is unclear whether Dickens approached the bench with his counsel. Dickens did not speak during the colloquy, and no questions were directed to him. However, when Mr. McCants raised the issue with Judge Motley, he stated that "Mr. Dickens and I have a preliminary matter," and he asked "if *we* could possibly approach" (emphasis added). The bench conference then commenced. In any event, as we explain, the trial court conducted an adequate inquiry regardless of whether Dickens was at the bench during the colloquy.

and a defendant's "satisfaction" with counsel is relevant to a determination of professional competence "only to the extent that any discontentment is tied to articulated claims of ineffectiveness"); *Stevens v. United States*, 683 A.2d 452, 454-55 (D.C. 1996) (holding that a brief inquiry was adequate where the defendant complained about one issue "that, as the trial judge knew, rested upon a misunderstanding of law and fact"; a second issue that the trial judge "had been fully able to evaluate"; and a third, vague reference to "other reasons, too").

Further, there was no need to question Dickens directly given the limited nature of the one articulated complaint, Mr. McCants' cursory reference to other possible matters, and Judge Motley's lengthy discussion with Mr. McCants regarding the complaint. *See, e.g.*, *Forte*, 856 A.2d at 575 ("We have required the trial court to question defense counsel and . . . the defendant, *if necessary*." (alteration in original) (internal quotation marks omitted)). Indeed, Dickens did not voice displeasure at subsequent pretrial hearings which he attended. Accordingly, we hold that Judge Motley did not abuse his discretion when conducting his inquiry.

### III.    Conclusion

The judgments of the Superior Court are hereby

*Affirmed.*

Separate Statement of *Associate Judge* FISHER:  D.C. Code § 22-1805 (2012 Repl.) provides that "all persons advising, inciting, or conniving at the offense, or aiding or abetting the principal offender, shall be charged as principals[.]"  This statute was produced by a "reform movement" which also led to the enactment of 18 U.S.C. § 2.  *See Standefer v. United States*, 447 U.S. 10, 17-19 (1980).  "The purpose of D.C. Code § 22-1805 was to abolish the distinction between principals and accessories and render them all principals."  *Tann v. United States*, 127 A.3d 400, 438 n.19 (D.C. 2015) (internal quotation marks omitted); *accord*, *Wilson-Bey v. United States*, 903 A.2d 818, 837 (D.C. 2006) (en banc) (same).

Although cases such as *Griffin* and *Inyamah* have limited the impact of the decision in *Brooks v. United States*, 599 A.2d 1094 (D.C. 1991), there is enduring mischief in some of its language, which suggests that, despite this legislative reform, courts still are obliged to assign roles—in other words, to determine which defendant was "the principal" and which defendant was "an aider and abettor."  *See, e.g.*, *id*. at 1099 ("[T]here must be evidence that someone other than defendant

was the principal whom the defendant aided and abetted." (internal quotation marks and emphasis omitted)); *id*. at 1100 n.10 (rejecting "the proposition that the main wrongdoer can be the aider or abettor of a minor participant in the unlawful conduct").[1] For purposes of determining liability, however, this is a pointless exercise. *See Tyree v. United States*, 942 A.2d 629, 636 (D.C. 2008) ("In law, the aider and abettor is equally as culpable as the principal.").[2]

The helpful legacy of *Brooks* is its reminder that the doctrine of aiding and abetting does not apply unless there was more than one participant in the crime— "One cannot aid or abet himself." 599 A.2d at 1099. Thus, when asked to give an aiding and abetting instruction, the trial court should focus on whether the evidence

---

[1] The majority in *Brooks* felt itself bound by *Payton v. United States*, 305 A.2d 512 (D.C. 1973), which states that "there must be evidence that someone other than defendant was the principal whom the defendant aided and abetted." *Id*. at 513; *see Brooks*, 599 A.2d at 1099, 1102 n.19. However, the *holding* in *Payton* was based on the lack of evidence that anyone else was involved in the crime. To support the statement quoted above, the court in *Payton* cited *Morgan v. United States*, 159 F.2d 85 (10th Cir. 1947), and *United States v. Horton*, 180 F.2d 427 (7th Cir. 1950). Both decisions rest on recognition that "[o]ne cannot aid and abet in the commission of a crime unless there is another who has committed the offense. In other words, one cannot be an aider and abettor of himself in the commission of an offense." *Morgan*, 159 A.2d at 87; *see Horton*, 180 F.2d at 431 (quoting this language from *Morgan*).

[2] The degree of culpability may, of course, be highly relevant to sentencing.

shows that the defendant acted alone or with one or more other persons.[3] As the standard jury instruction properly explains, "Any person who in some way intentionally participates in the commission of a crime can be found guilty either as an aider and abettor or as a principal offender. It makes no difference which label you attach." Criminal Jury Instructions for the District of Columbia, No. 3.200 (5th ed. rev. 2016).

---

[3] It is not necessary that the other participants have been identified, prosecuted, or convicted. *See, e.g.*, *Standefer*, 447 U.S. at 20; *Brooks*, 599 A.2d at 1099.