*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-CF-0116

MASON BINION, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2018-CF1-001370)

(Hon. Ronna Beck, Trial Judge)

(Argued April 24, 2024            Decided August 8, 2024)

*Xiaonan April Hu*, with whom *Johnathan I. Kravis* was on the briefs, for appellant.

*Kevin Birney*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney, *Chrisellen R. Kolb*, *Nicholas P. Coleman*, *Gilead I. Light*, and *Michael P. Spence*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and HOWARD and SHANKER, *Associate Judges*.

SHANKER, *Associate Judge*: Michael Taylor was killed shortly after a botched drug deal in June 2008. The case went cold after a months-long investigation. Seven

years later, police received a tip that led to the arrest of Mason Binion for first-degree murder in connection with Mr. Taylor's death.

During pretrial proceedings, the government expressed concern regarding Mr. Binion's legal competence after it overheard Mr. Binion talking to himself. After two competency evaluations, a forensic psychologist opined that Mr. Binion was incompetent to proceed. Despite this opinion, the government, Mr. Binion, Mr. Binion's counsel, and the trial court believed Mr. Binion to be competent. After taking the parties' views and conducting its own "competency voir dire" at a hearing, the trial court declared Mr. Binion competent to proceed. Mr. Binion was convicted as charged.

Mr. Binion now argues, among other things, that the competency hearing was procedurally inadequate under the Fifth and Fourteenth Amendments. We disagree with Mr. Binion and conclude that the procedures employed during the competency hearing were constitutionally adequate. We also find unpersuasive Mr. Binion's arguments that the trial court erred in declining to instruct the jury on a self-defense defense and in instructing the jury on aiding-and-abetting and co-conspirator liability. We therefore affirm his conviction.

# I.    Background

The parties adduced the following evidence at trial.  On June 21, 2008, the decedent, Mr. Taylor, approached his acquaintance Calvin Tillman about arranging a purchase of marijuana on behalf of several buyers, including Mr. Binion.  The buyers gave Mr. Taylor money for the purchase.  Mr. Tillman contacted the seller, who agreed to sell him and Mr. Taylor the marijuana at a hotel.  Mr. Tillman and Mr. Taylor drove to the hotel area together while the buyers drove to the hotel in a separate car.  On the way to the hotel, Mr. Tillman and Mr. Taylor realized that the buyers did not provide enough money for the purchase.  Believing that the buyers were setting him and Mr. Taylor up, the two abandoned the plan to go to the hotel and decided instead to split up.  Mr. Tillman took off with the money.

Mr. Binion was upset because he and the other buyers "got played."  After the botched drug deal, Mr. Binion and Joshua Massaquoi, another buyer, retrieved a .22-caliber gun.  Mr. Massaquoi, Mr. Binion, and two other men—Victor Carvajal and Derrick Williams—then drove to Coffield Recreation Center in Silver Spring, Maryland, where they were to reconnect with Mr. Taylor.  The men picked up Mr. Taylor, who was armed with an unloaded .380-caliber Glock.  The five then drove back into Washington, D.C., and into an alley.

In the alleyway, Mr. Binion, Mr. Taylor, Mr. Carvajal, and Mr. Williams got out of the car while Mr. Massaquoi stayed in the driver's seat. Mr. Massaquoi initially saw Mr. Taylor standing near the car but lost sight of him, as if Mr. Taylor was lying down on the ground. Mr. Massaquoi overheard Mr. Taylor say "No, Mason," while Mr. Binion and Mr. Carvajal were standing over him. Mr. Massaquoi heard gunshots and saw sparks and knew that Mr. Taylor had "got[ten] hit." Mr. Massaquoi did not see who shot Mr. Taylor and did not see Mr. Binion holding the gun during the shooting itself, but he thought that Mr. Binion fired the bullet.[1] After Mr. Taylor's murder, the group drove back to Mr. Binion's house.

The next morning, officers of the Metropolitan Police Department ("MPD") found Mr. Taylor dead in the alleyway. Mr. Taylor had suffered a fatal gunshot wound to the back of his head and a gunshot wound to his finger. At the scene, police recovered several gun cartridges and casings. An autopsy report noted that bullet fragments consistent with a .22-caliber cartridge were found in Mr. Taylor's

---

[1] Mr. Massaquoi had a history of significant mental illness, including schizophrenia, and suffered from hallucinations which made him "believe[ ] some things to be true that weren't actually true." Mr. Massaquoi also perjured himself repeatedly while on the stand, initially testifying that he committed the murder by himself and that he could not remember what Mr. Binion did on the day of the murder.

cerebellum and body bag. Police did not recover a weapon on Mr. Taylor's body. Although MPD conducted a months-long investigation, it did not arrest anyone in connection with Mr. Taylor's death at that time.

Seven years later, in August 2015, MPD received an email from Mr. Massaquoi, who claimed to have "information that can help the closure of the murder of Michael Taylor." Following testimony from Mr. Massaquoi and others, a grand jury indicted Mr. Binion on one count of first-degree murder while armed. Mr. Binion was convicted and sentenced to 45 years of imprisonment to be followed by five years of supervised release.

Mr. Binion timely appealed.

## II.    Analysis

Mr. Binion argues that the trial court erred when it: (1) failed to conduct a procedurally adequate competency hearing; (2) denied his request for a self-defense instruction; and (3) provided an aiding-and-abetting and a co-conspirator instruction to the jury. We address each claim in turn.

### A.     Procedural Adequacy of the Competency Hearing

Mr. Binion asserts that the trial court's competency proceeding was procedurally inadequate.[2]   The government disagrees, contending that the trial court's second "mental observation hearing," discussed below, was an adequate competency hearing.  We agree with the government that the procedures employed in determining Mr. Binion's competence were constitutionally adequate.

### 1.  Additional Background

On March 22, 2019, the prosecution expressed concern that Mr. Binion's mental health was "declin[ing]" after seeing Mr. Binion talk to himself "out loud" "a lot."  The trial court agreed that Mr. Binion's behavior was concerning and ordered an initial competency evaluation.  Mr. Binion did not believe that he had mental health issues but consented to an examination.

---

[2] Mr. Binion also argues that the trial court found him competent without holding a hearing.  As discussed in more detail below, however, the trial court held a "mental observation hearing" on May 7, 2019, in which it inquired into, and ultimately determined, Mr. Binion's competence to proceed.  Whatever the formal label of the hearing, "it is apparent from the record . . . that competency was considered by the court at that time." *State v. Johnson*, 551 N.W.2d 742, 752 (Neb. Ct. App. 1996).  The only issue related to competency, then, is whether the mental observation hearing was procedurally adequate.

*a.  Competency screening and first mental observation hearing*

On March 29, 2019, Dr. Lia Rohlehr, a forensic psychologist employed by the D.C. Department of Behavioral Health, conducted a fifty-five-minute preliminary competency screening of Mr. Binion.  In her report, Dr. Rohlehr noted that Mr. Binion was able to identify his attorney, whom he "liked."  Mr. Binion remarked that his attorney "is being great and has done great."  When asked what he could do to help his attorney, he stated, "Whatever's necessary, continue to stay out of trouble" and that he would "[t]alk to [his attorney] about" any conflicts he might have with her.  Mr. Binion accurately described various legal processes, such as guilty pleas, and the roles of various courtroom personnel, including the judge and prosecutor.

Despite these observations, the preliminary report stated that Mr. Binion "presented with pressured, tangential speech, increased energy levels, and animated mannerisms" and that he "was unable to provide direct answers to several questions."  "Mr. Binion also expressed grandiose beliefs, some of which appear[ed] to be delusional," including that he "has his own record label and that he recently sold a song to actor/comedian Katt Williams."  According to Dr. Rohlehr, Mr. Binion was "aware of the allegations against him, but presented a bizarre

account of the allegations in which he left out the accusation of murder."[3]  Based on these observations, Dr. Rohlehr ultimately opined that Mr. Binion was "incompetent to proceed" and recommended a full competency examination.

On April 1, 2019, the trial court held its first mental observation hearing and ordered that Mr. Binion undergo a full competency evaluation on Dr. Rohlehr's recommendation.

### b.  Full competency evaluation and second mental observation hearing

Dr. Rohlehr conducted a full evaluation of Mr. Binion on May 2, 2019, and issued a final report a few days later.  At the evaluation, Mr. Binion arrived late, "appeared upset," and stated that he "[didn't] like" Dr. Rohlehr because of her previous recommendation.  Because Mr. Binion "was very upset with [Dr. Rohlehr] and [due to] the fact that he was ordered to participate in another evaluation," Dr. Rohlehr had to end the evaluation early.  Accordingly, she was unable to ask "the formal line of competency-related questions."

Although the evaluation ended early, the report made certain findings and conclusions.  Mr. Binion again presented with "pressured and tangential" speech and

---

[3] Mr. Binion later acknowledged the full allegations, although he disagreed with the murder charge.

animated behavior and expressed "grandiose beliefs." Although the report "assumed that [Mr. Binion] continue[d] to possess [the] factual knowledge" of the court process and proceedings against him, Mr. Binion now held "paranoid beliefs regarding the government." He also "spoke in a rambling manner" about his first attorney, who he believed was "doing illegal things behind his back," and said that he did not trust his current attorney "to invite him into relevant conversations." He further stated that his current attorney "needs to get with me because I'm the greatest."

Based on the above, Dr. Rohlehr again concluded that Mr. Binion was incompetent to proceed. The report recommended further evaluation in an effort "to assess whether he is likely to attain competence in the foreseeable future."

On May 7, 2019, the trial court held a second mental observation hearing, soliciting the parties' views of Mr. Binion's competence to proceed. The trial court was interested in counsels' views, at least in part, because "[u]nder the *Dusk*[*y v. United States*, 362 U.S. 402 (1960) (per curiam)] standard . . . especially on matters of ability to consult with counsel, counsel's view is to be given as much weight as [the] professional[']s view."

The government stated that it had no concerns about Mr. Binion's competence to proceed and expressed skepticism of the report's conclusions: "although

[Dr. Rohlehr] has made a determination that [Mr. Binion is] not competent to proceed at this point, she hasn't asked any of the standard questions that are always asked." The government also suggested that if competency doubts persisted, it might need to "obtain [its] own expert" to evaluate Mr. Binion. Mr. Binion's counsel also disagreed with Dr. Rohlehr's incompetency finding. Although she acknowledged Mr. Binion's "idiosyncrasies" and the possibility of "mental health concerns," Mr. Binion's counsel stated that she was "certainly" "comfortable . . . challenging the report." Indeed, Mr. Binion, through counsel, also sought leave to "hire our own expert to challenge the conclusions in the report."

The trial court also raised doubts about Dr. Rohlehr's conclusions. It did not believe that the incompetence finding was supported by the symptoms that Mr. Binion exhibited. The trial court did not know how to square the report's finding that Mr. Binion had a "factual understanding of the proceedings against him [and] the legal system in general" with its conclusion that "his rational understanding and his ability to consult with counsel are likely [to] be affected by his current mental state." In the trial court's view, "[v]irtually everyone who exhibits those symptoms is competent."

Given the concerns raised by both the government and Mr. Binion's counsel about the report, as well as its own reservations about Dr. Rohlehr's incompetency

finding, the trial court conducted "a very limited competency voir dire" to ensure that Mr. Binion had "a basic ability to understand the proceedings and assist [his] counsel." Neither party objected. The court asked Mr. Binion a series of factual questions, including: "[W]hat's the lead charge against you?"; "[D]o you understand what the penalty for that is?"; "Do you understand the difference between [a not-guilty plea] and a guilty plea?"; "[W]hat would be the benefit of [a guilty plea] be?"; "Do you understand . . . the role of the prosecutor[?]"; "Do you know what your attorney does in the trial?"; "[W]ho has to prove something in a trial?"; "[W]hat [does the government] have to prove beyond a reasonable doubt?"

Mr. Binion gave mostly satisfactory answers to these questions but expressed confusion at times. For example, he did not know what the role of the prosecutor was and did not know how prosecutors would prove his guilt beyond a reasonable doubt at trial. This led the trial court to wonder if there "[m]ight be issues with the way [it was] asking" its questions and whether Mr. Binion "really [had] a firm grasp on" how the trial would work. Nevertheless, the court concluded that it was "satisfied with [Mr. Binion's] competence" and that it "[didn't] think that there[ was] a competency issue." It suggested, however, that Mr. Binion "speak with [his trial counsel] further about the questions that I asked." Neither party objected to the competency finding. The court instructed Mr. Binion's counsel to raise any further concerns about Mr. Binion's competency in the future.

The issue of Mr. Binion's competence was not raised at any point thereafter.

## 2. Standard of Review

The parties disagree about the standard we should employ when reviewing the procedural adequacy of a competency hearing. Mr. Binion urges us to adopt an abuse-of-discretion standard; the government contends that plain-error review is appropriate because Mr. Binion did not object to the procedures employed by the trial court. Because we conclude that the competency proceedings were procedurally adequate under either standard, we do not decide the question.

## 3. Discussion

"The Due Process Clause of the Fifth (and Fourteenth) Amendment prohibits the criminal prosecution of a defendant who is incompetent to stand trial." *Hargraves v. United States*, 62 A.3d 107, 111 (D.C. 2013); *see also Pate v. Robinson*, 383 U.S. 375, 378 (1966) ("[T]he conviction of an accused person while he is legally incompetent violates due process."). Competency must exist "at all stages of the prosecution." *United States v. Casteel*, 717 F.3d 635, 641 (8th Cir. 2013) (internal quotation omitted); D.C. Code § 24-531.02(a) ("A defendant shall not be tried, be sentenced, enter a guilty plea, or be subject to revocation of probation

or a transfer proceeding if the trial court determines that the defendant is incompetent.").

The substantive standard for determining competency is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether [the defendant] has a rational as well as factual understanding of the proceedings against him." *Drope v. Missouri*, 420 U.S. 162, 172 (1975) (quoting *Dusky*, 362 U.S. at 402). "[A] defendant is incompetent if he or she is unable to perform either of these functions." 1A Charles Allen Wright & Arthur R. Miller, Fed. Prac. & Proc. Crim. § 209 (5th ed. 2023). In this jurisdiction, "[a] defendant is presumed to be competent" unless he or she establishes incompetence "by a preponderance of the evidence." D.C. Code § 24-531.04(b); *cf. Medina v. California*, 505 U.S. 437, 449 (1992) (holding that requiring defendants to bear the burden of proving incompetence comports with due process).

As a necessary corollary to this substantive standard, the Supreme Court has also mandated that "state procedures" used to determine competency "must be adequate to protect [the defendant's substantive] right" not to be tried or convicted

while incompetent.[4]  *Pate*, 383 U.S. at 378.  Criminal defendants, therefore, have certain procedural due process rights in the determination of their competency.  *See United States v. Flores-Martinez*, 677 F.3d 699, 705-06 (5th Cir. 2012) ("In addition to this substantive right, the criminal defendant has a procedural due process right that guarantees procedures adequate to guard an accused's right not to stand trial or suffer conviction while incompetent." (internal quotations omitted)).  Although neither this court nor the Supreme Court has spelled out precisely what procedures courts must employ in determining competency, at "a minimum," a competency hearing "must be of record and both parties must be given the opportunity to examine all witnesses who testify or report on the accused's competence."  *Hansford v. United States*, 365 F.2d 920, 924 n.8 (D.C. Cir. 1966).  The hearing must provide the court with an opportunity to make "an informed judicial determination" of the

---

[4] In the District, the "procedures for evaluating a defendant's competence are spelled out in the Incompetent Defendants Criminal Commitment Act of 2024," D.C. Code §§ 24-531.01-.13 (the "IDCCA").  *Hargraves*, 62 A.3d at 111.  Mr. Binion does not ask us to decide whether the hearing conducted by the trial court complies with the strictures of the IDCCA; he argues only that the hearing was constitutionally deficient.  *See* Reply Br. at 8 ("The issue on appeal concerns Mr. Binion's *constitutional* due process rights.  Whether the D.C. Code requires a trial court to [employ certain procedures] has no bearing on whether the Constitution requires the trial court to [employ those procedures].").  We do not decide whether or to what extent the IDCCA is coextensive with federal due process requirements.

defendant's competence to proceed. *Holloway v. United States*, 343 F.2d 265, 268 (D.C. Cir. 1964).

Mr. Binion argues that the second mental observation hearing fell short of what federal due process requires. In particular, he notes the following procedural deficiencies: (1) no witnesses testified; (2) because the hearing was held on the morning after the final report was released, the parties had no opportunity to prepare other experts, call Dr. Rohlehr to testify, or gather additional evidence; (3) the trial court failed to give Dr. Rohlehr's report adequate weight and substituted its own determination "based on nothing more than a 'very limited voir dire' of Mr. Binion"; and (4) the trial court placed undue weight on defense "counsel's view" of Mr. Binion's competency.

Under typical adversarial circumstances, some aspects of the competency hearing would give us pause. Had Mr. Binion asserted his incompetence and sought Dr. Rohlehr's testimony, we might find it troubling that Dr. Rohlehr was not present to testify, D.C. Code § 24-531.03(d)(3), or that the trial court scheduled the competency hearing just one day after Dr. Rohlehr issued her final report, *cf. 1417 Belmont Cmty. Dev., LLC v. District of Columbia*, 302 A.3d 512, 517 (D.C. 2023) ("The Due Process Clause requires the government to provide *adequate* notice . . . before depriving an individual of a protected liberty or property interest."

(emphasis added)).   But far from maintaining his incompetence, Mr. Binion expressed a desire to "*challenge*" Dr. Rohlehr's report.[5]  The government agreed. And Mr. Binion's counsel stated that she was "certainly" "comfortable . . . challenging the report" despite Mr. Binion's "idiosyncrasies" and possible "mental health concerns."[6]  Even if Mr. Binion or his trial counsel had latent reservations about his competency to proceed, the trial court expressly allowed the parties to "raise concerns" about his competency at any point after the hearing; neither Mr. Binion nor counsel raised the issue again.   Given the unanimous agreement among the parties and the court regarding Mr. Binion's competence, it is

---

[5] Mr. Binion also maintained his competency on other occasions, including during his final meeting with Dr. Rohlehr.

[6] Mr. Binion posits, citing *Blakeney v. United States*, 77 A.3d 328 (D.C. 2013), that his trial counsel may have harbored doubts about his competency yet declined to raise them because doing so would have put her in "a difficult ethical position."  According to Mr. Binion, counsel to possibly incompetent defendants must "abide by a client's decisions concerning the objectives of representation," D.C. Rule of Professional Conduct 1.2, yet simultaneously "move for evaluation of the defendant's competence to proceed . . . even if the motion is over the defendant's objection," American Bar Association's Criminal Justice Standards on Mental Health Standard 7-4.3(c) (2016).  As *Blakeney* itself concluded, however, no such ethical conflict exists: "[i]t is well-settled that counsel is obligated to raise the issue [of competence] over the defendant's objections if reason exists to doubt the defendant's competency."  77 A.3d at 345.  "To the extent counsel perceives a conflict between raising competency and the defendant's best interests, counsel's obligation to the court to raise the issue must prevail."  *Id.* (internal quotations omitted).  Moreover, Mr. Binion provides nothing other than a strained reading of the hearing transcript to substantiate his claim that trial counsel felt ethically obligated to withhold concerns about his competency.

far from clear what more Mr. Binion could have gained from calling witnesses or having greater notice of the competency hearing. Indeed, if Mr. Binion had achieved the aims his counsel expressed at the hearing, he would only have strengthened the case for his competency. Any due process error that the trial court committed by failing to call witnesses or provide greater notice of the hearing was therefore harmless.

We also do not perceive any error in the trial court's suggestion that it should consider "counsel's view" of Mr. Binion's competence. Even if the trial court overstated the value of counsel's views, this and other courts have held that, while not "determinative, a defendant's counsel is in the best position to evaluate a client's comprehension of the proceedings." *Hernandez v. Ylst*, 930 F.2d 714, 718 (9th Cir. 1991); *accord Blakeney v. United States*, 77 A.3d 328, 342, 374 (D.C. 2013) (noting that trial counsel has an "important role[ ] to play in ensuring that only competent defendants are tried" and that "trial counsel's actual experience working closely with [defendant] on his defense belied the conclusion that he was incompetent"); *see also Phenis v. United States*, 909 A.2d 138, 153 (D.C. 2006) (finding no abuse of discretion in the trial court's determination of competence where, among other things, the court "heard defense counsel's repeated assertions to the trial court that once appellant began taking his medications, he was cooperative and able to assist her"). We therefore find it significant that Mr. Binion's trial counsel expressed

"certain[ty]" in "challenging the report."[7] At any rate, the trial court did not appear to rely extensively on—much less defer to—counsel's view of Mr. Binion's competency. It came to its own conclusion, accounting holistically for Dr. Rohlehr's report, its own questioning of Mr. Binion, and the parties' consensus as to Mr. Binion's competence to proceed.

None of this is to say, of course, that a trial court is free to disregard an expert report, even when all parties and the defendant disagree with its ultimate finding. After all, a "medical opinion on the mental competency of an accused is usually persuasive evidence" on the issue. *Blakeney*, 77 A.3d at 346 (internal quotation omitted). But while a court may not "arbitrarily disregard, disbelieve, or reject" an expert opinion on competence, *Prost v. Greene*, 652 A.2d 621, 629 (D.C. 1995) (alterations omitted), neither is it bound by it, *see Hooker v. United States*, 70 A.3d

---

[7] We are unpersuaded by Mr. Binion's argument that his trial counsel never expressed a view on Mr. Binion's competence. This position is difficult to square with counsel's use of the first person in answering whether *she* had "issues regarding [Mr. Binion's] competence." Mr. Binion's trial counsel responded, "I mean—are there any idiosyncrasies? Certainly. Mr. Binion and I have talked about that, that's not a secret. Are there mental health concerns? Maybe. He doesn't think so, but maybe. . . . [B]ut *I* think *I'm* comfortable right now challenging the report[,] certainly." Nor, as discussed below, does her acknowledgement of Mr. Binion's possible "mental health concerns" alter our assessment of trial counsel's views of his competence. *See Gorbey v. United States*, 54 A.3d 668, 678 (D.C. 2012) ("[N]ot every manifestation of mental illness demonstrates incompetence to stand trial." (internal quotation omitted)).

1197, 1203 n.5, 1205 (D.C. 2013). It is the *court's* responsibility to determine competency in the final analysis. *See id.* at 1203 ("At no point was the court required or even permitted to rely exclusively on the 'incompetency' conclusion in [the] preliminary screening report[.]"); *Blakeney*, 77 A.3d at 343 n.33 ("No clinical diagnosis, by itself, can be relied on to make a determination of adjudicative incompetence. While defendants who are incompetent often have severe mental disorders . . . many still are competent to proceed with adjudication." (internal quotations omitted)); D.C. Code § 24-531.04(c)(1) ("At the conclusion of the hearing, the *court* shall" determine competence (emphasis added)).

Mr. Binion argues that the trial court failed to give sufficient deference to Dr. Rohlehr's report and that the court should have asked specific questions regarding Mr. Binion's ability to consult with counsel. We conclude, however, that the trial court's "competency voir dire," though nominally "very limited," was procedurally adequate to override the report's findings and that the trial court was not required to ask questions specifically targeting Mr. Binion's ability to consult with counsel. Several considerations support this conclusion.

First, Dr. Rohlehr's report was, by its own terms, limited in scope and incomplete. Because Mr. Binion arrived late to the evaluation, Dr. Rohlehr did not ask "the formal line of mental status questions" or "the formal line of

competency-related questions." Moreover, Dr. Rohlehr terminated the evaluation early, after only thirty-five minutes. Such limitations play an important role in determining the deference owed to expert opinions and, therefore, in assessing the adequacy of the procedures employed by the trial court in overriding expert findings. *See Blakeney*, 77 A.3d at 346 (recognizing that "well-founded concerns about the basis and reliability of the [expert] opinion and compelling contrary evidence conceivably may dispel whatever force the expert's evaluation may possess"). As the trial court noted, the report had not "done the standard competency evaluation" and the court did not "see much in [the report] that [shook it] from" the view that Mr. Binion was competent.[8]

Second, the preliminary and final reports in fact provided considerable support for Mr. Binion's competence. Although Dr. Rohlehr was unequivocal in her finding that Mr. Binion was incompetent to proceed, the final report acknowledged that Mr. Binion "was fully oriented to person, place, and situation; and [he] did not

---

[8] We express no opinion whether, as a substantive matter, Mr. Binion was or was not competent to proceed. We note only that the limits of Dr. Rohlehr's report factor into our analysis of the adequacy of the trial court's procedures. *See Lassiter v. Department of Social Services of Durham County, N.C.*, 452 U.S. 18, 24-25 (1981) ("Applying the Due Process Clause is . . . an uncertain enterprise which must discover what 'fundamental fairness' consists of in a particular situation . . . ."); 16B Barbara J. Van Arsdale, *et al.*, Am. Jur. 2d Constitutional Law § 939 ("That which may, in one setting, constitute a denial of. . . due process may, in other circumstances and in the light of other considerations, fall short of such denial.").

appear to be responding to internal stimuli." Mr. Binion also "demonstrated a factual understanding of the court process," "the proceedings against him," and "the legal system in general," all integral parts of the substantive competency inquiry.

It is also not clear to us that Dr. Rohlehr's incompetency finding necessarily rose to the level required for legal incompetence. The specific basis for the report's incompetency finding was that Mr. Binion's "rational understanding and ability to consult with counsel are *likely to be affected* by his current mental state." Although this may have been so, the appropriate legal standard for competence is whether the defendant has "*sufficient*" ability to consult with his or her lawyer "with a reasonable degree of rational understanding," D.C. Code § 24-531.01(1) (emphasis added), not whether a psychological condition might merely "affect" the defendant's communication. *Cf. Hooker*, 70 A.3d at 1203 ("[G]iven the court's expressed (and valid) concern about whether [the psychiatrist's] . . . findings . . . corresponded to the legal standard for competence and the court's own observations of [the defendant] on the day of the trial, the court would likely have abused its discretion had it given [the expert's] report the great weight that appellant urges . . . ." (footnote omitted)); *Gorbey v. United States*, 54 A.3d 668, 678, 680 (D.C. 2012) ("Not every manifestation of mental illness demonstrates incompetence to stand trial. . . . Courts have held repeatedly that bizarre and irrational behavior cannot be equated with mental incompetence to stand trial." (internal quotation omitted)). As noted above,

the trial court did not see how the symptoms described in Dr. Rohlehr's report amounted to incompetence.

Third, all parties and the court agreed that Mr. Binion was competent to proceed. Mr. Binion's counsel and the government were also satisfied that the trial court's "competency voir dire" was sufficient to address Dr. Rohlehr's reports.

In light of the foregoing circumstances, we find the trial court's "competency voir dire" sufficiently comprehensive to supersede the report's incompetency finding. During the colloquy, the court asked over twenty questions concerning, among other topics, the charges; the penalty if found guilty; the meaning and strategic benefit of pleading guilty; the role of the prosecutor, Mr. Binion's own counsel, and the trial judge; and what the government's burden would be at trial. Although the trial court wondered whether it was "asking these questions in the right way," Mr. Binion provided correct or reasonable responses to nearly all of the court's questions. In our view, Mr. Binion's answers to these questions—at least in light of the circumstances addressed above—gave the trial court adequate information to determine whether Mr. Binion was competent to proceed.

Mr. Binion argues that none of the trial court's questions directly addressed Mr. Binion's "ability to communicate with his . . . lawyer." While that may be true, it is not altogether clear to us that the trial court had an independent obligation to ask

such targeted questions.  *See Higgenbottom v. United States*, 923 A.2d 891, 898 (D.C. 2007) ("The trial court fulfilled its obligation to inquire into appellant's competency, and any further advocacy on appellant's behalf at this point was the responsibility of appellant and his counsel.").  We need not decide that issue, however, because we are satisfied that the questions that were asked, in conjunction with the circumstances surrounding the competency hearing described above, provided the trial court with sufficient information to make a determination about Mr. Binion's ability to consult with counsel.

"Competency requires only the *ability* to consult with one's attorney" with a reasonable degree of rational understanding; the inquiry is not whether the defendant does so "in every instance."  *United States v. Prigmore*, 15 F.4th 768, 777 (6th Cir. 2021) (emphasis added) (internal quotation omitted).  Thus, competency does not focus on a defendant's relationship with his or her current lawyer.  Instead, evidence of incompetence must be "indicative of a general incapacity to consult with *any* lawyer."  *United States v. Leggett*, 162 F.3d 237, 243 (3d Cir. 1998) (emphasis added); *see also United States v. Miller*, 531 F.3d 340, 349 (6th Cir. 2008) ("[A] defendant is not rendered incompetent to stand trial merely because he cannot get along with his counsel or disapproves of his attorney's performance.").

To be sure, Mr. Binion expressed some paranoid beliefs about his trial counsel during his final evaluation. He stated, for example, that "when he is in court he sits very close to his current attorney because he does not want her to talk to anyone without him hearing" and that he did not "trust her to invite him into relevant conversations." But these statements were not necessarily reflective of an inability to consult with counsel generally. In fact, several other statements that Mr. Binion made to Dr. Rohlehr reflected a willingness and ability to trust and consult with counsel. At the initial competency screening, Mr. Binion remarked that he "liked" his trial counsel, who was "being great and ha[d] done great." At that time, Mr. Binion expressed a willingness to do "[w]hatever's necessary" to help his trial counsel and that he would "[t]alk to her about" any conflicts he might have with her before taking more drastic measures. Mr. Binion's statements during the initial competency screening therefore undermine his argument that he was broadly unable to consult with counsel, especially in light of the presumption of competence. *See* D.C. Code § 24-531.04(b). Moreover, the trial court's voir dire assessed whether Mr. Binion held a factual and rational understanding of the proceedings against him and the legal system generally—the critical tools necessary to participate in his defense. The record also shows that the trial court was aware that Mr. Binion's "basic ability" to "assist [his] counsel" was an integral part of the competency inquiry, and we find it significant that Mr. Binion's trial counsel expressed no

difficulties in communicating with him at any time. Accordingly, we conclude that the trial court was not required to ask questions specifically concerning Mr. Binion's ability to consult with counsel.

Had Mr. Binion contested his competence or had there been stronger indications of an inability to consult with counsel, this might be a different case. But the strictures of procedural due process are not so inflexible. *See Hannah v. Larche*, 363 U.S. 420, 442 (1960). Under the circumstances presented here, we conclude that the trial court's competency hearing was procedurally adequate or, in any event, any due process violation was harmless.

## B. Self-Defense Instruction

Mr. Binion next argues that the trial court erred when it denied his request for a self-defense instruction. The government responds that there was insufficient evidence to warrant such an instruction. We agree with the government.

### 1. Additional Background

The evidence showed that, before the botched drug deal, Mr. Taylor was armed with a .380-caliber Glock handgun. Mr. Taylor fired the gun into the air earlier that day during an unrelated altercation. By the time Mr. Taylor arrived at the Coffield Recreation Center, however, the handgun was unloaded.

After the men picked up Mr. Taylor from the recreation center, they drove to an alley and got out of the car. Mr. Taylor was standing near the car with the other men while Mr. Massaquoi remained in the car. Mr. Taylor got on the ground, with Mr. Binion and Mr. Carvajal standing over him. Mr. Taylor said, "No, Mason." Mr. Massaquoi heard gunshots, saw sparks, and knew that Mr. Taylor had "got hit." A person living nearby testified that she heard three gunshots coming from the alleyway. She heard a "pop," followed by a man saying "ow," followed by two more "pops" in short succession. The men then drove away.

At the scene, police recovered several gun cartridges and casings. These included (1) a discharged and "rusty and tarnished" nine-millimeter cartridge casing lying "three or four garages down" from Mr. Taylor's body; (2) an undischarged .22-caliber cartridge lying on top of Mr. Taylor; (3) two undischarged .22-caliber cartridges near Mr. Taylor's body; and (4) two discharged .22-caliber cartridges also near Mr. Taylor's body. While "it appeared [that the nine-millimeter casing] had been sitting out there for a while," the .22-caliber ammunition appeared "shiny and metallic." Additionally, the firing impressions left on two of the fired .22-caliber cartridges exhibited some differences. One impression appeared "longer" and "a little bit wider" than the other, suggesting that the bullets might have been fired from two different weapons. However, the possibility that both bullets were fired from

the same firearm could not be excluded because the differences in firing pin impressions were "slight."

Mr. Taylor was shot on his pointer finger and in the back of the head by a .22-caliber round.  Officers did not locate Mr. Taylor's handgun, if he in fact had one at the time of his death.

Near the end of trial, Mr. Binion requested a self-defense instruction.  The court held a hearing to determine "what basis there would be for giving any self-defense instruction[ ]."  Mr. Binion pointed to the fact that Mr. Taylor had a firearm earlier in the day, the different cartridges found on the scene, and the testimony of the witness.

The trial court declined to give a self-defense instruction, finding that "at most" the evidence showed that Mr. Taylor was armed, not that "there was any display of a weapon at any time" during the incident.  Although the different calibers suggested "a possibility that there was more than one firearm" in the alley, there was "no affirmative evidence of there being more than one firearm" at the time of Mr. Taylor's murder.  Moreover, the court found that the nine-millimeter ammunition was located several garages down from Mr. Taylor's body and was "rusty," indicating that it had been fired much earlier than the other cartridges found in the alley.

## 2. Standard of Review and Legal Background

"We review a court's refusal to issue a particular jury instruction for abuse of discretion." *Steinke v. P5 Solutions, Inc.*, 282 A.3d 1076, 1091 (D.C. 2022). We consider "the record in the light most favorable to the requesting party." *Dickens v. United States*, 163 A.3d 804, 810 (D.C. 2017) (internal quotation and brackets omitted).

The parties disagree on what quantum of evidence entitles a defendant to a jury instruction. Mr. Binion asserts that "a defendant is entitled to a jury instruction . . . if the instruction is supported by any evidence, however weak." *Kittle v. United States*, 65 A.3d 1144, 1157 (D.C. 2013). In his view, "even a modicum of evidence" would entitle him to a self-defense instruction. The government, on the other hand, argues that a defendant is "entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Blocker v. United States*, 239 A.3d 578, 590 (D.C. 2020) (internal quotation omitted).

This court has used both formulations repeatedly, even recently.[9] For purposes of this opinion, however, the distinction between these two formulations is "academic," and we do not decide which formulation controls. *Holloway*, 25 A.3d at 902. Mr. Binion did not proffer the necessary evidence for a self-defense instruction under either standard.

To be entitled to a self-defense instruction, the evidence must show that "(1) there was an actual or apparent threat to the defendant; (2) the threat was unlawful and immediate; (3) the defendant honestly and reasonably believed that he was in imminent danger of death or serious bodily harm; and (4) the defendant's response was necessary to save himself from danger." *Rorie v. United States*, 882 A.2d 763, 771 (D.C. 2005) (internal quotation and brackets omitted).

---

[9] For cases applying the "however weak" standard, *see, e.g.*, *Wilson v. United States*, 266 A.3d 228, 238 (D.C. 2022); *Lewis v. United States*, 263 A.3d 1049, 1067 (D.C. 2021); *Cheeks v. United States*, 168 A.3d 691, 696 (D.C. 2017). For cases applying the "sufficient evidence" standard, *see, e.g.*, *Bost v. United States*, 178 A.3d 1156, 1200 (D.C. 2018); *Lihlakha v. United States*, 123 A.3d 167, 169 (D.C. 2015); *Holloway*, 25 A.3d at 902 ("The words 'however weak' may be misleading. Perhaps it would be more precise to say that 'a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor.'" (quoting *Mathews v. United States*, 485 U.S. 58 (1988)); *McCrae v. United States*, 980 A.2d 1082, 1086 & n.4 (D.C. 2009).

### 3. Discussion

Mr. Binion largely reasserts the same arguments he made at trial. In particular, he contends that three pieces of evidence entitled him to a self–defense instruction: (1) Mr. Taylor was seen with a .380 handgun several hours before he was killed; (2) the witness heard a single gunshot, followed by an exclamation of pain, followed by two gunshots in short succession; and (3) the cartridges recovered from the scene suggest the presence of at least two firearms.

We conclude that the evidence Mr. Binion marshaled—viewed separately or taken together—did not entitle him to a self-defense instruction. First, although Mr. Taylor had a gun "that night," there was no evidence that Mr. Taylor possessed the gun at the time he was killed. Mr. Massaquoi never testified that Mr. Taylor took out his gun at any time. Nor did the police recover Mr. Taylor's handgun during their search of the alley. *Cf. Henry v. United States*, 94 A.3d 752, 759 (D.C. 2014) (defendant not entitled to self-defense instruction where there "was no evidence that either [a witness] or appellant perceived that [the decedent] was armed"). Even if Mr. Binion established that Mr. Taylor had the gun in the alley, he presented no evidence that Mr. Taylor ever took out the gun, much less so in such a way that could justify a self-defense instruction. *See id.* (defendant not entitled to self-defense instruction because "no evidence was presented that gave the jury a basis for finding

that appellant *reasonably* believed that [the decedent] was about to start shooting" (internal quotation omitted)). The location of Mr. Taylor's gunshot wound—the back of the head—further suggests that the shooter was not acting in self-defense when he pulled the trigger.

Second, Mr. Binion's ballistics arguments do not move the needle. Mr. Binion places undue weight on the importance of the lone nine-millimeter casing found in the alleyway. Although Mr. Binion's weapon could not fire a nine-millimeter round, the casing was found a significant distance away from Mr. Taylor's body, was rusty, and appeared to be older than the .22-caliber ammunition, which was "shiny and metallic." According to the government's firearm expert, "it appeared [that the nine-millimeter casing] had been sitting out there for a while."[10] All of this evidence suggests that the nine-millimeter bullet was not fired during the murder. The record instead reflects that the shooter used a

---

[10] Nor is it altogether clear from the expert testimony that Mr. Taylor's .380-caliber handgun could have fired a nine-millimeter cartridge. Instead, Mr. Binion appears to assume that a .380-caliber gun could fire a nine-millimeter cartridge because a nine-millimeter cartridge is approximately .357 or .355 inches in diameter, smaller than what could be fired out of a .380-caliber firearm. Although a weapon can sometimes fire "the wrong caliber ammunition," the firearm expert never testified that a .380-caliber handgun could fire a nine-millimeter cartridge, much less that the nine-millimeter cartridge found in the alleyway was in fact fired by such a weapon. Moreover, as mentioned above, Mr. Taylor's gun—assuming that he had it at the time of his death—was unloaded at the time he was killed.

.22-caliber weapon to fire two .22-caliber bullets, consistent with Mr. Taylor suffering two injuries.

Nor are we persuaded by Mr. Binion's argument that the "dissimilar markings" between the fired .22-caliber cartridges adequately supports a self-defense instruction. True, dissimilar firing pin impressions may suggest that the cartridges were "fired from two different firearms." But the microscopic differences present here were "slight" and the firearms expert could not exclude the possibility that the bullets were fired from the same firearm. Even if "slight differences" existed, the expert confirmed that "you might expect slightly different firing pin impressions" on the two cartridges even if fired from the same gun.

Finally, the witness's testimony does not get Mr. Binion's argument over the line. The witness overheard three distinct "pops"—one "pop," followed by a man saying "ow," and then two additional "pops"—which Mr. Binion asserts could signify an exchange of gunfire. Unrebutted evidence showed, however, that even if Mr. Taylor had a weapon at the time he was killed, it was unloaded and thus it was impossible for him to contribute to the gunshots. Nor, as described above, was there any ballistic support for this theory—quite the opposite. A self-defense instruction under these circumstances would require the jury to impermissibly "rely on purely speculative inferences or to engage in bizarre reconstructions of the evidence" to

find that Mr. Taylor fired his weapon in the alley. *Id.* at 757 (internal quotations omitted).

We therefore conclude that the trial court did not abuse its discretion in declining to give a self-defense instruction. Under any standard, Mr. Binion failed to proffer the quantum of evidence necessary to receive such an instruction.

### C. Aiding-and-Abetting and Conspiracy Instructions

Finally, Mr. Binion asserts that the trial court erred in granting the government's request for aiding-and-abetting and co-conspirator instructions because there was no evidence supporting them. The government counters that it introduced evidence sufficient to support those instructions.

### 1. Additional Background

After the presentation of evidence, the trial court decided to give both aiding-and-abetting and conspiracy instructions, over Mr. Binion's objection. The court reasoned that the jury "could believe that Mr. Binion was very much involved with this incident but that someone else ultimately was the one who fired the gun."

During closing argument, the government emphasized that Mr. Binion had not killed Mr. Taylor alone. Rather, he acted alongside Mr. Massaquoi, Mr. Carvajal, and Mr. Williams. Regarding the conspiracy, the government noted that Mr. Binion

told Mr. Massaquoi to get a gun, went with him to get it, sat next to Mr. Massaquoi while he unloaded the bullets and started cleaning them, asked who wanted to kill Mr. Taylor, and spoke with Mr. Taylor to arrange the meeting at the recreation center. Although the government argued that Mr. Binion shot Mr. Taylor, it allowed for the possibility that one of the other men fired the bullet.

During its deliberations, the jury sent the trial judge a note asking, "Do we need to determine that Mason Binion fired the gun in order to determine that the defendant caused the death of Michael Taylor[?]" The court referred the jury back to its aiding-and-abetting and co-conspirator instructions.

## 2. Standard of Review and Legal Background

"We review the trial court's decision to give a requested jury instruction for abuse of discretion, viewing the instructions as a whole, and considering the record in the light most favorable to the requesting party." *Dickens*, 163 A.3d at 810 (internal quotations omitted).[11] Even if an instruction is given in error, we will not reverse if we can conclude, "with fair assurance . . . that the judgment was not

---

[11] As above, we do not decide what quantum of evidence a party must proffer to entitle it to an instruction.

substantially swayed by the error." *Headspeth v. United States*, 86 A.3d 559, 565 (D.C. 2014) (ellipses in original) (internal quotation omitted).

"The elements of aiding and abetting are that (1) a crime was committed by someone, (2) the accused assisted or participated in its commission, and (3) his participation was with guilty knowledge." *Dickens*, 163 A.3d at 810 (internal quotations omitted). To prove a conspiracy, the "government must establish that an agreement existed between two or more people to commit a criminal offense; that the defendant[ ] knowingly and voluntarily participated in the agreement, intending to commit a criminal objective; and that, in furtherance of and during the conspiracy, a co-conspirator committed at least one overt act." *Tann v. United States*, 127 A.3d 400, 424 (D.C. 2015) (per curiam) (internal quotation omitted).

### 3. Discussion

Mr. Binion's primary contention against both instructions is that the government failed to present any evidence that someone other than Mr. Binion committed the actual shooting. According to Mr. Binion, "the government presented testimony and evidence aimed at convincing the jury that Mr. Binion, and no one else, shot and killed Mr. Taylor."

We disagree. The government's central witness, Mr. Massaquoi, established that one of the three men standing outside the car in the alley—Mr. Binion, Mr. Carvajal, and Mr. Williams—killed Mr. Taylor. Mr. Massaquoi, however, did not observe which of the three men pulled the trigger.[12] Although Mr. Massaquoi heard Mr. Taylor say "No, Mason" before he was shot, Mr. Carvajal was also standing over top of Mr. Taylor, with Mr. Williams nearby. Mr. Massaquoi only assumed that Mr. Binion fired the shot because he was the last person to have the gun. There was, therefore, considerable ambiguity regarding which person pulled the trigger.[13]

This ambiguity, combined with much of the other evidence described above, supports both an aiding-and-abetting and a conspirator liability instruction. *See Dickens*, 163 A.3d at 812-13 (aiding-and-abetting instruction appropriate where the defendant assisted or participated in the murder, but it was unclear whether he or his co-defendant pulled the trigger). It is no answer, as Mr. Binion suggests, that the government's primary "theory of the case was that Mr. Binion shot and killed Mr. Taylor over a botched drug deal." The appropriate inquiry is whether there was

---

[12] Although Mr. Massaquoi testified before the grand jury that Mr. Binion shot Mr. Taylor, he clarified at trial that he did not actually see Mr. Binion pull the trigger.

[13] Contrary to Mr. Binion's assertion, the government expressly allowed for the possibility that one of the other men fired the fatal shot.

enough evidence to support the instruction. *See Inyamah v. United States*, 956 A.2d 58, 62-63 (D.C. 2008) (upholding aiding-and-abetting instruction despite "strong and compelling" evidence that defendant acted as a principal).

Accordingly, we find no abuse of discretion in the trial court's decision to instruct the jury on aiding-and-abetting and conspiracy liability.

### III.   Conclusion

For the foregoing reasons, we affirm Mr. Binion's conviction.

*So ordered*.